**SNAP–ON TOOLS CORPORATION,**
Plaintiff,

v.

**WINKENWEDER & LADD, Inc.,**
Defendant.

No. 49 C 1587.

United States District Court
N. D. Illinois, E. D.

Oct. 31, 1956.

Harry C. Alberts, Chicago, Ill., for plaintiff.

Herman T. Van Mell, Richard B. Finn, Norton L. Penney, Chicago, Ill., Frank Zugelter, Zugelter & Zugelter, Cincinnati, Ohio, for defendant.

KNOCH, District Judge.

Plaintiff seeks injunctive relief against infringement and unfair competition in the use by defendant of plaintiff's trade-name and -mark "Snap-On" to which plaintiff asserts common-law rights. Defendant asserts that this Court lacks jurisdiction because plaintiff has failed to establish the requisite

statutory amount; that plaintiff's mark is not a valid trade-mark, but a mere descriptive term for which plaintiff has failed to sustain the burden of showing a secondary meaning designating plaintiff or plaintiff's products, or fraudulent intent on the part of defendant in passing off other goods as those of the plaintiff.

The case came on for hearing before the Court on the pleadings and the evidence consisting of oral testimony, documentary proofs, and physical exhibits. Witnesses were called by the respective parties whose testimony was transcribed in the record. The Court has had the benefit of argument of counsel on written briefs and memoranda, has weighed the arguments presented and studied the authorities advanced in support of the respective assertions of the parties.

Upon a careful consideration of the whole case, the Court makes the following:

### Findings of Fact

1. Plaintiff, Snap-On Tools Corporation, is a Delaware corporation, with its principal office and place of business in Kenosha, Wisconsin.

2. Defendant, Winkenweder & Ladd, Inc., is an Illinois corporation, with its principal office and place of business in Chicago, Illinois. Defendant is a resident and inhabitant of the Northern District of Illinois, Eastern Division.

3. Defendant is the factory sales agent for the Snap-On Drawer Company, an Ohio corporation, with its principal office and place of business at Morrow, Ohio.

4. The Snap-On Drawer Company of Morrow, Ohio, filed a declaratory judgment complaint against the Snap-On Tools Corporation, plaintiff herein, in the United States District Court for the Southern District of Ohio, Western Division, Civil Action No. 2229, subsequent to the date the complaint herein was filed. The said Court held that the complaint in the Cincinnati, Ohio, case was directed to the same subject matter and issues involved in this case.

5. The Court of Appeals for the Sixth Circuit denied petition of Snap-On Drawer Company for writ of mandamus to vacate order staying proceedings in the Cincinnati, Ohio, action until this case is decided, upon the finding that the Snap-On Drawer Company, although not a formal party to this case, was in privity with the defendant herein, and that the issues in both cases were substantially the same.

6. The amount in controversy herein is in excess of $3,000 exclusive of interest and costs.

7. Plaintiff's applications to the United States Patent Office for registration of its trade-mark "Snap-On" under Section 2(f) of the Trade Mark Act of 1946, 15 U.S.C.A. § 1052(f), for hand tools, power tools, automobile service tools, etc.; metal tool boxes, tool trays, tool chests and table high supports therefor; gauge blocks and strips, measuring calipers and micrometers, etc.; have proceeded to the point of publication and oppositions Numbered 29567, 30428, and 29565, by Snap-On Drawer Company; no final decision having yet been made.

8. Plaintiff and its predecessors have been continuously engaged in the manufacture and sale of a large variety of tools and tool containers or cabinets since the year 1920. Its line of products has been ever expanding, and now comprises some 4,000 different tools, cabinets and accessories used by mechanics in automotive shops, industrial firms, hospitals, laundries, public utility firms, and wherever hand tools are used for service, repair, and maintenance requirements. Some of the tools and the tool containers or cabinets are not manufactured by plaintiff but are made to plaintiff's specifications. Some of the tools carry other names but all, including the cabinets, are sold under plaintiff's trade-name and -mark.

9. Plaintiff owns and operates three large manufacturing plants in the United States. It did not appear that the locations of these were known to the trade with the possible exception of the

main office and plant at Kenosha, Wisconsin.

10. Plaintiff's business is national and international in scope. Plaintiff owns and operates a subsidiary manufacturing plant in Canada which is also engaged in the manufacture and sale of various tools and cabinets throughout the Dominion of Canada.

11. Plaintiff has approximately 45 sales branches, throughout the United States and Canada, from which operate an average of between 650 and 820 dealers and salesmen, in all states of the United States and Canada, and these dealers and salesmen make an average of 32,000 calls daily in vending plaintiff's tools and cabinets. In a number of foreign countries, the plaintiff has distributors selling its line of tools and cabinets. Plaintiff distributes catalogs of its complete line of tools and cabinets to the trade every other year.

12. Under its trade-mark "Snap-On," plaintiff has sold individual drawer units since 1933, and plaintiff presently has in its line an individual drawer unit as well as multiple drawer units intended for vertical stacking for build-up into various combinations.

13. In the year 1920 plaintiff's predecessor adopted and used, and plaintiff now uses, on its various tools and cabinets the trade-mark "Snap-On" presently in the forms as shown in plaintiff's exhibits 1-D, 3-D, 5-D and 35-D. Since 1920, said use of the trade-mark "Snap-On" has been continuous and without interruption throughout the United States and in many foreign countries.

14. The plaintiff, Snap-On Tools Corporation, is known in the trade and generally referred to by the contraction "Snap-On" which is also its principal trade-mark impressed in various styles on its products, catalogs, and brochures. About 85% of its tools presently bear the trade-mark "Snap-On" and the remainder are identified with the trade marks, "Blue Point," "Supreme," and "Vacuum Grip." All these products are sold as "Snap-On Tools," and all the cabinets have thereon the name "Snap-On" or "Snap-On Tools."

15. The annual volume of business done by plaintiff under its trade-mark and -name "Snap-On" as described above, in 1949–1950 amounted to $15,-370,820. and presently amounts to more than $22 million each year. The sales volume from 1940 to 1950, inclusive, amounted to $143,699,035.

16. Plaintiff spends, and has for many years spent, large sums of money in advertising its tools and cabinets sold under its trade-name or -mark "Snap-On," or both, and has established a reputation for dependability for its products by a liberal policy of tool replacement which plaintiff pursues as an effective measure of maintaining the good will of its customers.

17. Plaintiff's trade-mark "Snap-On" means, and has meant for many years prior to defendant's use, to the trade and public, when applied to tools and cabinets, the products of the plaintiff. The trade-name "Snap-On Tools Corporation" and its contraction "Snap-On" means and has meant the plaintiff to the trade and public for many years prior to defendant's use on the accused drawer units.

18. As a result of plaintiff's large and extensive and long-continued sales of tools and cabinets sold under its trade-mark "Snap-On" and because of the long-continued and extensive advertising of plaintiff's products featuring the trade-mark and -name "Snap-On," said trade-mark and -name have become well known and impressed upon the mind of the trade and public as identifying plaintiff and plaintiff's products as well as indicating origin with plaintiff, and have become distinctive of plaintiff and its products and have acquired a secondary meaning indicating plaintiff and its products.

19. Plaintiff has built up and now has a valuable good will in its trade-mark and -name "Snap-On." In 1949–1950, plaintiff's good will in and to the trade-mark and -name "Snap-On" was valued at a sum in excess of $2,800,000 upon

recognized accounting methods of determination.

20. After the adoption and use by plaintiff of its trade-mark "Snap-On" for tools and cabinets, and after said trade-mark had acquired a distinctiveness with the trade and public as indicating plaintiff's tools and cabinets, the defendant began the solicitation of sales of cabinets and, specifically, drawer units bearing the name "Snap-On Drawer" on their handles and the trade-name "Snap-On Drawer Co., Morrow, Ohio" impressed on the body thereof, as shown in plaintiff's exhibits 4-D, 4-D-1, and 21-D.

21. After the adoption and use by plaintiff of its trade-mark and -name "Snap-On" for tools and cabinets and after said trade-mark and -name had acquired a distinctiveness with the trade and public as indicating plaintiff and plaintiff's products in connection with tools and cabinets, the defendant began soliciting orders for the accused drawers produced by the Snap-On Drawer Company of Morrow, Ohio, and began the distribution in eleven states of brochures of said Snap-On Drawer Company.

22. The defendant through the Snap-On Drawer Company as its source of supply, and in the capacity of factory sales agent for said Company, adopted and began the use of the name "Snap-On Drawer" and the trade-name "Snap-On Drawer Co., Morrow, Ohio," on the accused drawers with full knowledge of plaintiff's prior and extensive use of its trade-mark and -name, and with full knowledge that the trade and public associate the trade-mark "Snap-On" when applied to or used in connection with tools and cabinets with plaintiff and plaintiff's products.

23. Defendant's use of "Snap-On" as the dominant part of the trade-mark, trade-name and business styles, to wit: "Snap-On Drawer," "Snap-On Drawer Co.," and "Snap-On Drawer Company," is likely to cause confusion or mistake, and to deceive purchasers as to the source or origin of the accused drawers in that the trade and public are likely to attribute these goods to source or origin with plaintiff or with a concern connected with plaintiff.

24. Defendant's use of "Snap-On" is without the consent of plaintiff, and against its express will.

25. Plaintiff has requested the defendant to discontinue use of "Snap-On," but defendant has refused and continued to use "Snap-On."

26. All drawers which have been sold by defendant, or for which defendant solicited orders, which bear the words "Snap-On Drawer," also bear in clearly legible type the words: "Snap-On Drawer Co., Morrow, Ohio;" however, the latter words and the word "Drawer" in "Snap-On Drawer," are in smaller, less distinct and noticeable type than the word "Snap-On."

27. No evidence was introduced which proved that plaintiff had actually suffered any pecuniary damage because of defendant's solicitation of orders for drawers having thereon the word "Snap-On" as a trade-mark and "Snap-On Drawer Co.," as a trade-name.

### Conclusions of Law

1. Defendant's use of "Snap-On" as a trade-mark and as a part of the business type, style, or trade-name on the accused drawers and on brochures distributed by the defendant in connection with drawer units, infringes plaintiff's trade-name and -mark "Snap-On."

2. Defendant's use of "Snap-On" in connection with the advertising and sale of drawer units is likely to mislead the trade and public into believing that defendant is in some way legitimately connected with plaintiff.

3. Defendant's use of "Snap-On" as a dominant part of the trade-mark "Snap-On Drawer" and as a part of certain of their business type, style, or trade-name "Snap-On Drawer Co.," or "Snap-On Drawer Company," in connection with the sale and advertising of drawer units constitutes unfair competition with plaintiff.

■ 4. Plaintiff's trade-name "Snap-On" has acquired a secondary meaning and plaintiff now possesses valid exclusive rights in law to said trade-name for tools, cabinets, and kindred products.

■ 5. Plaintiff's trade-mark "Snap-On" has acquired a secondary meaning for tools, cabinets and kindred products, and designates the plaintiff and plaintiff's products in this commercial field.

6. Defendant's solicitation of orders · for the drawer units with the word "Snap-On" as a trade-mark and as part of certain of its business types, styles, and trade-names, to wit: "Snap-On Drawer Co.," or "Snap-On Drawer Company," in connection with the sale and advertising of drawer units or cabinets is likely to result in passing off, in the trade, of the accused products as and for products of plaintiff or of a business legitimately connected with plaintiff.

■ 7. Plaintiff is entitled to a judgment restraining the defendant, its agents, servants, employees, privies, successors, or assigns, and all holding by, through, or under them from:

(a) Using the word "Snap-On" or any reproduction, counterfeit, copy or colorable imitation thereof, as a brand name or trade-mark for cabinets, and specifically for drawer units;

(b) Using the word "Snap-On" or any reproduction, counterfeit, copy or colorable imitation thereof, in any firm or corporate name or business style, to wit: "Snap-On," "Snap-On Drawer Co.," or "Snap-On Drawer Company," in connection with the production, sale or distribution of cabinets or boxes for any purpose;

(c) Engaging in the sale or distribution of any drawers or cabinets bearing the trade-mark "Snap-On" or any reproduction, counterfeit, copy, or colorable imitation thereof; and

(d) Doing any act or thing calculated to induce the belief that the defendant or its merchandise is in any way connected with the plaintiff or plaintiff's products.

8. Nothing herein contained shall prevent the legitimate use of the words "snap on" in textual matter when such is used unemphasized and without a hyphen in a grammatically complete statement of function or action.

9. Plaintiff having established that the statutory jurisdictional amount is involved herein, defendant's motion to dismiss for want of jurisdiction must be denied.

10. Plaintiff having established that the words "Snap-On" used as its trade-name and -mark have acquired a secondary meaning designating plaintiff and plaintiff's products, defendant's motion to dismiss for failure to sustain the burden of such proof must be denied.

Order in conformity with the foregoing may be presented to the Court within 20 days from the date hereof.