**SNAP-ON TOOLS CORPORATION,**
Plaintiff-Appellee,

v.

**WINKENWEDER & LADD, Inc.,**
Defendant-Appellant.

No. 11991.

United States Court of Appeals
Seventh Circuit.
Dec. 10, 1957.

Penney, Chicago, Ill., Finn & Van Mell, Chicago, Ill., of counsel, for appellant.

Casper William Ooms, Harry C. Alberts, Chicago, Ill., Robert C. Williams, Chicago, Ill., Robert L. Grover, Kermit L. Caves, Kenosha, Wis., of counsel, for appellee.

Before MAJOR, FINNEGAN and HASTINGS, Circuit Judges.

FINNEGAN, Circuit Judge.

Snap-On Tools Corporation, plaintiff, manufactures and sells tools and cabinets bearing the name Snap-On, its trademark, and defendant solicits orders for specialty drawers sold as Snap-On Drawers, which are manufactured by the Snap-On Drawer Company of Morrow, Ohio. This suit was commenced for unfair competition in the trade and for trade-mark infringement because, as plaintiff alleges, the name "Snap-On Drawers" and firm name "Snap-On Drawer Co." are colorable imitations of plaintiff's trademark and corporate name contraction "Snap-On." Relying on common law rights, plaintiff asked for and received, injunctive relief against infringement by, and unfair competition in, defendant's use of plaintiff's trade-name and -mark. The scope of that restraint, arrived at after the district court heard and received extensive evidence, is as follows. Defendant is restrained from:

(a) Using the word "Snap-On" or any reproduction, counterfeit, copy or colorable imitation thereof, as a brand name or trade-mark for cabinets, and specifically for drawer units;

(b) Using the word "Snap-On" or any reproduction, counterfeit, copy or colorable imitation thereof, in any firm or corporate name or business style, to-wit: "Snap-On," "Snap-On Drawer Co.," or "Snap-On Drawer Company," in connection with the production, sale or distribution of cabinets or boxes for any purpose;

(c) Engaging in the sale or distribution of any drawers or cabinets bearing

Richard B. Finn, Chicago, Ill., Frank Zugelter, Cincinnati, Ohio, Norton L.

the trade-mark "Snap-On" or any reproduction, counterfeit, copy, or colorable imitation thereof; and

(d) Doing any act or thing calculated to induce the belief that the defendant or its merchandise is in any way connected with the plaintiff or plaintiff's products.

As one of the chief grounds for reversal and remandment of the final judgment, entered below, defendant stresses Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73. Such heavy reliance is, however, misplaced. Inapplicability of that opinion to the facts now before us is quickly shown in these two significant aspects mentioned by Mr. Justice Brandeis when explaining the Kellogg factual background: (1) "Since during the life of the patents 'Shredded Wheat' was the general designation of the patented product, there passed to the public upon the expiration of the patent, not only the right to make the article as it was made during the patent period, but also the right to apply thereto the name by which it had become known * * * [citing and quoting]" and, (2) " * * * [T]o establish a trade name in the term 'Shredded Wheat' the plaintiff must show more than a subordinate meaning which applies to it. It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer. This it has not done."

The current appeal involves points diametrically opposed to the two enumerated in Kellogg, supra. Item 1 is offset by finding of fact numbered 7, entered in the district court [150 F.Supp. 794]:

"Plaintiff's applications to the United States Patent Office for registration of its trade-mark 'Snap-On' under Section 2(f) of the Trade Mark Act of 1946, 15 U.S.C.A. § 1052(f), for hand tools, automobile service tools, etc.; metal tool boxes, tool trays, tool chests and table high supports therefor; gauge blocks and strips, measuring calipers and micrometers, etc.; have proceeded to the point of publication and oppositions Numbered 29567, 30428, and 29565, by Snap-On Drawer Company; no final decision having yet been made."

■ From the evidence in the record before us we are satisfied that the findings of fact made by the district judge corresponding to point 2 in Kellogg, as well as the others he made, are not clearly erroneous, Fed.Rules Civil Procedure, Rule 52, 28 U.S.C., and we refuse to set them aside.

This is a comparatively simple instance of where a manufacturer, the plaintiff at bar, engaging in a national and international business, has continuously produced roughly 4000 different tools and tool containers or cabinets, since 1920. All of these items are sold under plaintiff's trade-name and-mark, and since the evidence supports the findings of fact, certain of them are reprinted below:

"Under its trade-mark 'Snap-On,' plaintiff has sold individual drawer units since 1933, and plaintiff presently has in its line an individual drawer unit as well as multiple drawer units intended for vertical stacking for build-up into various combinations.

"In the year 1920 plaintiff's predecessor adopted and used, and plaintiff now uses, on its various tools and cabinets the trade-mark 'Snap-On' presently in the forms as shown in plaintiff's exhibits 1–D, 3–D, 5–D and 35–D. Since 1920, said use of the trade mark 'Snap-On' has been continuous and without interruption throughout the United States and in many foreign countries.

"The plaintiff, Snap-On Tools Corporation, is known in the trade and generally referred to by the contraction 'Snap-On' which is also its principal trade-mark impressed in various styles on its products, catalogs, and brochures. About 85% of its tools presently bear the trade-

mark 'Snap-On' and the remainder are identified with the trade marks, 'Blue Point,' 'Supreme,' and 'Vacuum Grip.' All these products are sold as 'Snap-On Tools,' and all the cabinets have thereon the name 'Snap-On' or 'Snap-On Tools.'

"The annual volume of business done by plaintiff under its trademark and -name 'Snap-On' as described above, in 1949–1950 amounted to $15,370,820, and presently amounts to more than $22 million each year. The sales volume from 1940 to 1950, inclusive, amounted to $143,699,035.

"Plaintiff spends, and has for many years spent, large sums of money in advertising its tools and cabinets sold under its trade-name or -mark 'Snap-On,' or both, and has established a reputation for dependability for its products by a liberal policy of tool replacement which plaintiff pursues as an effective measure of maintaining the good will of its customers.

"Plaintiff's trade-mark 'Snap-On' means, and has meant for many years prior to defendant's use, to the trade and public, when applied to tools and cabinets, the products of the plaintiff. The trade-name 'Snap-On Tools Corporation' and its contraction 'Snap-On' means and has meant the plaintiff to the trade and public for many years prior to defendant's use on the accused drawer units.

"As a result of plaintiff's large and extensive and long continued sales of tools and cabinets sold under its trade-mark 'Snap-On' and because of the long continued and extensive advertising of plaintiff's products featuring the trade-mark and -name 'Snap-On,' said trademark and -name have become well known and impressed upon the mind of the trade and public as identifying plaintiff and plaintiff's products as well as indicating origin

with plaintiff, and have become distinctive of plaintiff and its products and have acquired a secondary meaning indicating plaintiff and its products.

"Plaintiff has built up and now has a valuable good will in its trademark and -name 'Snap-On.' In 1949–1950, plaintiff's good will in and to the trade-mark and -name 'Snap-On' was valued at a sum in excess of $2,800,000. upon recognized accounting methods of determination.

"After the adoption and use by plaintiff of its trade-mark 'Snap-On' for tools and cabinets, and after said trade-mark had acquired a distinctiveness with the trade and public as indicating plaintiff's tools and cabinets, the defendant began the solicitation of sales of cabinets and, specifically, drawer units bearing the name 'Snap-On Drawer' on the handles and the trade-name 'Snap-On Drawer Co., Morrow, Ohio' impressed on the body thereof, as shown in plaintiff's exhibits 4–D, 4–D–1, and 21–D.

"After the adoption and use by plaintiff of its trade-mark and -name 'Snap-On' for tools and cabinets and after said trade-mark and -name had acquired a distinctiveness with the trade and public as indicating plaintiff and plaintiff's products in connection with tools and cabinets, the defendant began soliciting orders for the accused drawers produced by the Snap-On Drawer Company of Morrow, Ohio, and began the distribution in eleven states of brochures of said Snap-On Drawer Company.

"The defendant through the Snap-On Drawer Company as its source of supply, and in the capacity of factory sales agent for said Company, adopted and began the use of the name 'Snap-On Drawer' and the trade-name 'Snap-On Drawer Co., Morrow, Ohio,' on the accused

drawers with full knowledge of plaintiff's prior and extensive use of its trade-mark and -name, and with full knowledge that the trade and public associate the trade-mark 'Snap-On' when applied to or used in connection with tools and cabinets with plaintiff and plaintiff's products.

"Defendant's use of 'Snap-On' as the dominant part of the trade-mark, trade-name and business styles, to-wit: 'Snap-On Drawer,' 'Snap-On Drawer Co.,' and 'Snap-On Drawer Company,' is likely to cause confusion or mistake, and to deceive purchasers as to the source or origin of the accused drawers in that the trade and public are likely to attribute these goods to source or origin with plaintiff or with a concern connected with plaintiff.

"Defendant's use of 'Snap-On' is without the consent of plaintiff, and against its express will.

"Plaintiff has requested the defendant to discontinue use of 'Snap-On,' but defendant has refused and continued to use 'Snap-On.'

"All drawers which have been sold by defendant, or for which defendant solicited orders, which bear the words 'Snap-On Drawer,' also bear in clearly legible type the words: 'Snap-On Drawer Co., Morrow, Ohio'; however, the latter words and the word 'Drawer' in 'Snap-On Drawer,' are in smaller, less distinct and noticeable type than the word 'Snap-On.'

"No evidence was introduced which proved that plaintiff had actually suffered any pecuniary damage because of defendant's solicitation of orders for drawers having thereon the word 'Snap-On' as a trade-mark and 'Snap-On Drawer Co.,' as a trade-name."

We think there is abundant evidence adequately supporting the findings disclosed in this record that Snap-On means the plaintiff corporation in the market place where the contested items are brought for sale. "Snap-On" now stands for the plaintiff and its products, this we think is what is encompassed by the phrase "secondary meaning." Jewel Tea Co., Inc. v. Kraus, 7 Cir., 1951, 187 F.2d 278, 283. The name of the plaintiff manufacturer has become the sign of a physical thing, e. g. the product. The relation between the sign and object has been categorized by advertising and other investments of time, effort and capital, consequently defendant's contentions posited on generic names or terms are inapposite.

Defendant's detailed argument on the adequacy of jurisdictional grounds only requires reference to the total opinion in Seagram-Distillers Corporation v. New Cut Rate Liquors, Inc., 7 Cir., 1957, 245 F.2d 453, where this court described the so-called "Class B" cases. In any event the district court found the value of plaintiff's trademark to be in excess of $2,000,000 and, we think, correctly rejected defendant's jurisdictional challenge.

After briefing and oral arguments were heard, counsel for each party addressed letters to members of the panel which had the case under advisement. These communications rehashing certain cited authorities were unwarranted and unauthorized. We have disregarded both such letters.

The judgment appealed is affirmed.

Judgment affirmed.