## PARAMOUNT PRODUCTIONS, Inc., v. SMITH.

### No. 8288.

Circuit Court of Appeals, Ninth Circuit.
July 26, 1937.
Rehearing Denied Sept. 15, 1937.

864

H. W. O'Melveny, Walter K. Tuller, Louis W. Myers, Pierce Works, and Jackson W. Chance, all of Los Angeles, Cal., for appellant.

Zach Lamar Cobb and Earl A. Littlejohns, both of Los Angeles, Cal., for appellee.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

Judgment was rendered for appellee in his action against appellant for breach of contract, and the latter appealed.

It is admitted by the pleadings that appellee is the sole author of a story entitled "Cruise to Nowhere"; that appellee sold the story to appellant on April 29, 1933, for $2,500, as evidenced by a written contract containing the terms and conditions of the sale. This contract contains the following provisions:

"Second: The Author hereby grants to the Purchaser all the motion picture rights throughout the world, in and to and in connection with the said story, together with the sole and exclusive rights to use, adapt, translate, subtract from, add to and change the said story and the title thereof in the making of motion picture photoplays and/or as a part of and/or in conjunction with any motion picture photoplay and/or to combine the said story with any other work, to use the said title and/or any similar title in conjunction with motion picture photoplays based upon the said story and/or other literary, dramatic and/or dramatico-musical workds [works]. * * *"

"Eighth: The Purchaser agrees to announce on the film of the motion picture photoplays that may be produced pursuant hereto that such motion picture photoplays are based upon or adapted from a story written by the Author, or words to that effect."

In paragraph "Second," supra, by the use of the recondite and occult typographical jumble "and/or," a near approach to totality of confusion and unintelligibility has been accomplished, but, inasmuch as the determination of this appeal is dependent upon the construction of the eighth paragraph of the contract rather than the second, we abandon without regret all effort to determine, by reference to its written word, the meaning, if any there be, of the provisions of the second paragraph aforesaid.

The complaint alleged that in 1934 appellant completed the production and thereafter exhibited generally throughout the United States a "talking motion picture" under the title of "We're Not Dressing," which "was based upon, and adapted from, said original story of plaintiff herein, entitled 'Cruise to Nowhere' * * *"; that appellant violated the eighth provision of the contract quoted, in that appellant "wholly failed to announce upon said films, or at any of the public exhibitions thereof, that the same was either written by plaintiff, or that it was based upon, or adapted from, a story written by" appellee. Appellant admitted production and exhibition of the picture "We're Not Dressing," but denied the remainder of these allegations.

At the trial appellee introduced into evidence over appellant's objections a sheet showing production cost prepared by appellant's accounting department. This sheet contained the following:

"Production No. 983.

"Title 'We're Not Dressing'.

"From Story 'Cruise to Nowhere'."

The objection was "upon the ground that no proper foundation is laid to show that anyone connected with the accounting or auditing department, or that department itself, had anything to do with selecting either the title for a given picture, or determining whether a given picture should be based upon or adapted from a given story or not."

Appellee also offered in evidence an item released by the publicity department of appellant dated September 7, 1933, which contained the following statement: " 'We're Not Dressing' is an original story by Walton Hall Smith." Appellee also

offered in evidence a similar item dated December 13, 1933, which stated in part:

"Francis Martin * * * today was assigned to write the screen adaptation of 'We're Not Dressing' to be produced soon * * *

"Others working on the story, an original by Walton Hall Smith called 'A Cruise to Nowhere,' are * * *,"

Objection was made to both items on grounds identical with those urged against the admission of the production cost sheet, and counsel also stated: " * * * There is no foundation whereby the corporation may be bound, because, in order for the evidentiary matter to be an admission properly received as such, it must be made by one within the scope of his authority, and it must pertain to authority which he has."

The objections were overruled.

The trial court gave the following instruction to the jury: "Now, gentlemen, upon the evidence that the court has discussed a moment or so ago, upon the testimony as to earnings and the testimony as to failure on the part of the plaintiff to minimize the damages, there is an experience table of mortality that is applicable, and that may be used because in cases of this kind it is necessary to utilize the instruments that are possible or capable of utilization. One of these is that the experience table of mortality may be used if the jury concludes that it is proper to use it in the particular case; and under the American Experience Table of Mortality the expectant age of the defendant, under the stipulation that he is now 37 years of age, is 30.35 years. So that if you reach this question of damages you have the right to consider that together with all of the other elements that have been included in all of the instructions that have been heretofore given or that will be hereafter given in this case."

Upon the issues, the jury found in favor of appellee in the sum of $7,500. Judgment was entered on the verdict, from which judgment this appeal was taken.

Appellant contends that it was incumbent on appellee to prove that the accounting department and the publicity department were authorized to determine whether or not the picture produced was based upon or adapted from appellee's story. Appellant urges that, "in order to be binding upon the principal, admissions must be made by an agent while acting within the scope of his authority and must relate to matters to which that authority extends." Ferguson v. Basin Consolidated Mines, 152 Cal. 712, 713, 93 P. 867; Peterson Bros. v. Mineral King Fruit Co., 140 Cal. 624, 630, 74 P. 162; Birch v. Hale, 99 Cal. 299, 33 P. 1088; Beasley v. S. J. Fruit-Packing Co., 92 Cal. 388, 392, 28 P. 485. The same rule is applicable with respect to admissions of an officer of the corporation. Beasley v. S. J. Fruit-Packing Co., supra, 92 Cal. 388, 392, 28 P. 485. None of these cases is strictly in point. In each of them the person who made the admission was identified before the evidence was offered, or, in other words, it was known who made the admission. Here it is not denied that the admission was in fact made by some one for the corporation, but it did not appear who made the statement.

At the time the cost sheet was offered, there was no evidence as to the origin of the sheet, nor its content. There was proof that it was taken from the files of appellant, and produced by it. There was no proof, at the time it was offered, that it was made by or on behalf of any department. So far as the record shows, it might have been made by or on behalf of the board of directors, or by or on behalf of the production department, which appellant admits had authority to make such an admission. In other words, at the time the cost sheet was offered, the proof showed it was made for the corporation. If one agent or officer made it, it would have been made within his authority; if another agent or officer made it, it would not have been made within his authority.

There seems to be good ground for an exception to the rule mentioned. For example, suppose a prospectus is issued by a large corporation, which contains simply the corporate name at the end thereof, and in which an admission is made. If the rule mentioned is extended, then the person offering the prospectus would have to first prove who made the prospectus, before he could prove such person's authority. It is difficult to see how the party could prove such identity, short of questioning each officer, agent, and employee. Many corporations employ thousands of people. Such a rule would be impractical. Logic would compel admission as evidence of the admission so made, and, if the identity of the person who made the admission is thereafter proven, then the authority of the

person should be proven, or the admission, on motion, stricken.

■ However, assuming without deciding, that the rule relied upon by appellant is applicable here, then we believe the error did not affect the substantial rights of appellant. 28 U.S.C.A. § 391.

■ Appellant also contends that the cost sheet had no evidentiary value because the later evidence showed "that it was the practice of the accounting department to charge a story to ·a production when it had been bought for it, or for a specified star, whether the story was actually used or not. ·* * *" In the first place, this contention relates to the weight of the evidence and not to the admissibility thereof. In the second place, when such fact was proven, there was no renewal of the objection or a motion to strike. Therefore, no ruling of the trial court exists for review.

■ With respect to the publicity items it should be noted that both of them were issued before filming, and before the screen adaptation was written. We believe the error, if any, was cured by the repeated instructions of the trial court that the finished picture must have been based upon or adapted from appellee's story, since it was apparent to the jury that appellant may have changed its program. If the error was not cured, then it did not affect appellant's substantial rights. 28 U.S.C.A. § 391.

■ Appellant specified the admission of certain other evidence as error, in specifications numbered 7 to 13, both inclusive. With respect to these appellant says in its brief: "We have no desire unduly to prolong this brief and hence the matters dealing with asserted error in the admission of evidence * * * detailed in [the specifications mentioned] will be submitted without argument." Under such circumstances, error is not shown, and we treat these specifications as abandoned.

With reference to the instruction hereinabove set forth, appellant says that mortality tables are inadmissible as evidence in such a case as this, and relies on Johnson v. Richards, 50 Idaho, 150, 294 P. 507, Snyder v. Great Northern Ry. Co., 88 Wash. 49, 152 P. 703, and Swope v. City of Seattle, 36 Wash. 113, 78 P. 607. Appellee contends that the instruction was proper on the authority of Turner v. Jackson, 139 Or. 539, 4 P.(2d) 925, 11 P.(2d) 1048. The California courts seem not to have passed on the question.

■ We believe the error, if any, did not affect the substantial rights of the parties, but was a technical error. 28 U.S.C.A. § 391. The mortality table was not introduced into evidence. The court, judicially noting the table, simply instructed the jury to consider it with all the other evidence "if the jury concludes that it is proper to use it in the particular case."

Appellant says that the primary question is whether or not the picture was based upon or adapted from appellee's story. That statement is only partially true. Our function is to ascertain whether or not there is any substantial evidence to sustain the verdict. Specifically, the question presented is whether or not there is any substantial evidence to sustain the finding of the jury that the picture "We're Not Dressing" was based upon or adapted from appellee's story, "Cruise to Nowhere."

An examination of the record discloses that the evidence was conflicting. Three of appellant's witnesses defined and distinguished between "based upon" and "adapted from." There was evidence showing that the picture produced was not based upon or adapted from appellee's story. We are not interested in such evidence, however, but only in the evidence of the opposite fact.

■ The cost sheet hereinabove discussed is some evidence of the fact found by the jury. Correspondence between officers of appellant had some months before filming was started indicates that appellant may have used the story. Appellee introduced a manuscript of his story into evidence, and read it to the jury. During the trial, the court and its attendants, the jury, appellee, and counsel for the parties saw a showing of the picture. The jury was able to make a comparison. Afterward, appellee testified, "I saw in the picture much of the plot which I originally had in mind; much of the basic idea." We believe this is sufficient to warrant submission of the issue to the jury, and, since the jury believed it, the verdict is supported thereby.

■ Finally, appellant urges that there is a lack of evidence to support the award of damages, in that there was no standard by which damages could be gauged. Appellee contends that the true rule on uncertainty of damages is that the prohibition is directed against uncertainty as to cause, rather than uncertainty as to measure or extent.

We do not believe the evidence is subject to the charge of uncertainty. Appellee

testified that he and another writer collaborated in writing a story and sold it without screen credit for $10,000, which the two writers divided. Appellee's story was sold for $2,500, but under a contract that required that he be given screen credit. From these figures, the jury might easily compute the advertising value of the screen credit. He also testified that he received screen credit for a play; that prior thereto his salary was $250 per week; and that afterward he received $350 per week at one time, and $500 per week for a period of two weeks, due to the screen credit he had received. That evidence is, if believed, likewise sufficient as a gauge for the measure of the damages.

Finding no error affecting the substantial rights of appellant, the judgment is affirmed.

WILBUR, Circuit Judge (dissenting).

I dissent. With reference to the question as to whether or not there was substantial evidence that the film play produced by the defendant was based upon a story written by the plaintiff entitled "Cruise to Nowhere" and purchased by the defendant for the purpose of screen production, I am unable to agree with the conclusion of my associates. In the first place, statements contained in the books of the corporation showing that the cost of the story purchased from the plaintiff was charged against the film play produced by the defendant was clearly admissible as a declaration against interest. The same is true with reference to the press release indicating that the defendant produced a screen play based upon plaintiff's story. These admissions might be sufficiently substantial to sustain the verdict were it not for the fact that other evidence supplements and explains these admissions and deprives them of any weight. Beyond question, the defendant purchased the plaintiff's story for film reproduction and went to work to adapt it for screen reproduction. The admissions above referred to were made during the preliminary stages of screen adaptation. But the evidence shows that it was later decided that plaintiff's story was not suitable for the type of production desired at that time, and that several screen writers were employed to write the scenario for reproduction. Later, when the play was produced, they were given credit for this work, and the plaintiff was not given the credit to which he deemed himself entitled under his contract with the defendant. That the story pro-

duced was vastly different from that purchased is clear from a comparison of the two stories. It follows that the admissions of the defendant made at the time when it was the intention to use plaintiff's story became valueless in determining whether or not they did in fact use his story. I conclude, therefore, that the admissions of the defendant that the produced story "We're Not Dressing" was based upon plaintiff's story "Cruise to Nowhere" are without probative value in determining whether or not the plaintiff was entitled to screen credit.

The provision of the contract relating to screen credit is quoted in the main opinion, and it is unnecessary to repeat it. It is a method of advertising to the public the fact that the production they are about to witness is the result of the ingenuity, inventive genius, and literary skill of the person to whom screen credit is given. Thus it is believed other motion picture producers will seek to avail themselves of the services of the person given screen credit to produce other stories for such reproduction. It is clear that to give screen credit to a person not reasonably entitled thereto would be a fraud upon the public, while, on the other hand, to deny the author his contract rights if the play produced is based upon his story would be a violation of the contract.

In view of these conflicting considerations it is clear that in construing the terms of the contract for screen credit some attention must be given to the question as to whether or not the giving of such credit to a play which has been substantially changed would in effect be a falsehood tending to deceive the public. It should be stated that this factor of the problem has not been urged by the appellant. The appellant has confined its contention to the proposition that a film play is not based upon a story unless it so far resembles the story that to produce it without authority from the author of the story would, if copyrighted, violate the copyright, and therefore relies upon such copyright cases as Harold Lloyd Corp. v. Witwer (C.C.A.) 65 F.(2d) 1.

We have, however, a different question involved in the two types of cases. In the copyright case we have an intent to appropriate a story without compensation by making changes for the purpose of camouflaging theft, whereas in the case at bar we have the defendant owning a story and

making changes, not for the purpose of appropriating the property of another, but for the purpose of making the story more interesting and more profitable. Granting then, what seems obvious, that the changes in the plaintiff's story were made, not for the purpose of defrauding the plaintiff of his property, but for the purpose of adding to the interest and profit of the story, the question is, has the story been so far departed from in the play that it cannot reasonably be said to be based upon the plaintiff's story, having due regard to the rights of the plaintiff to credit for his achievement in producing the story, and the right of the public not to be deceived by reason of credit falsely given to an author.

With these facts in mind we must turn to a comparison of the film and the plaintiff's story, and from this comparison it must be determined whether or not there is so strong a resemblance between the two that the plaintiff was entitled to have the public informed through the screen production of the story that he was the author of the play, or, to put it in the words of the contract, that the play was based upon his story.

It is no doubt proper in such a case to assist the jury with the opinion of expert literary men and authors to indicate the points of resemblance and dissimilarity between the story and the play. I do not believe, however, that the fact that these experts may differ with relation to the literary value and the literary similarity of the story and the play would be such a conflict in the evidence as would justify and sustain a verdict where the story and the play were both presented to the jury for comparison. The trial judge and the appellate court should not be bound by the mere ipsa dixit of expert witnesses where the subject is one of general knowledge and the real question involved is not the impression conveyed by the picture to experts but the impression which the ordinary observer would receive. Harold Lloyd Corporation v. Witwer, supra.

I cannot believe that an extended analysis of the story and the play would be appropriate in a dissenting opinion in view of the conclusion which the majority of the court has reached. It will be sufficient to indicate my view to compare the testimony of Mr. George Marion, who claims to have written the story as it was finally screened, and the testimony of the plaintiff Marion testified:

"Mr. Glazer [the producer] and I talked it over five or six times. He gave me nothing in writing. He never wrote anything in connection with it; just a verbal conference. I am absolutely certain that Mr. Glazer did not write my story. I am certain that he did not write a line in the script that I have identified.

"Mr. Glazer's conferences with me were purely of a working nature, and as we went along I brought in material to him, and he discussed it, but there were no contributions beyond the idea of this background which already existed in my own story. ['Let's Go Native'.] The only contribution which he made to the working background of the story involved a group of people on a sea island. The idea of a boat starting out on a cruise and being wrecked was in 'Let's Go Native.' Naturally, he said something to me about it. He did so independent of my story. He told me that they had bought a story. He did not tell me what story they had bought. He never mentioned the name particularly, but he said they had purchased a piece of material which involved a shipwreck and people on a desert island. As I repeated before, I said I thought it was all right. I did know that they had bought a story based on this desert island scene. He did not tell me the substance of the story. He did not tell me a thing about it. He told me not to read it. He told me to write a script without reading the story as the story was being completely scrapped. It was a script. A script is the complete shooting continuity, including the actual dialogue and directions for the camera work on the set. An outline is simply the plot. It contains no dialogue. This script I wrote was not an outline. I never make outlines. I usually go right into the script after conversing with the producer. To a certain extent this script written by me was taken from the previous story of my own. There was a great deal of material in there which was original. The original material is simply gags and scenes in connection with characters and which Mr. Glazer said he would like to use. For instance, W. C. Fields. I did not discuss the name Jimmy with Mr. Glazer. I believe that when this script of mine was turned in, it was turned in under my name. It was simply turned in to the studio, because Mr. Glazer was not in the country at that time. I believe my several conversations with Mr. Glazer were had during the latter part of July and the first part of August. I don't know

when he returned from his trip abroad because I was not working with that studio at that time. I had gone over to another studio and another job. In the usual course of work at the studio, if they think there is enough to the story and they want an adaptation job, they actually give us the material purchased to read, and contribute to it what we think is of value. After that, the adapter contributes to the best of his ability."

Smith testified as follows: "With the view of the motion picture 'We're Not Dressing' freshly in my mind, as regards the similarity of that picture to my story 'Cruise to Nowhere', I would state the following: I saw in the picture much of the plot *which I originally had in mind;* much of the basic idea. I had forgotten how close it was to *the original conception* that I had in mind for this story, which was that these characters—obviously, among the characters, there were principal characters—would be unexpectedly thrown against a background. It didn't make any difference what the background would be at the time, which would enable—I say the two principal characters—to discover in each other characteristics which they otherwise would never have known. Obviously, they would never have met. *That was the original idea.* I thought to use a shipwreck, which would give me that quality with an unexpectedness which none of the characters would have anticipated. So it would have been a complete surprise—thrown into the ocean and thrown upon an uninhabited island. That would permit my principal character, whom I called Jimmy June, to display talents which perhaps even he did not know he had. Those talents, and whatever ability he had would be observed by the girl. I purposely made him poor and made her rich. I did not have any specific heiress, because that was not necessary to a straight dramatic story. She did observe the qualities of the principal male character. She admired them in him, and thus through this primitive background they were drawn together. The story ended as a romance in marriage. * * * I know from my own experience in studio work, for an original story of this type, it is much more true to the finished film than anything I had ever seen. I

mean they adhere closely to my plot. * * * In other words, I know, without this original story this picture would never have been made. *The lean-tos the man built, the skill with which he built them, the obvious leadership and quality of the leader, the plot—I say again, basically is paralleled in the story 'Cruise to Nowhere' and the picture 'We're Not Dressing'."* (Italics ours.)

Assuming that Marion wrote the photoplay as he testified, it is easy to account for such similarities as exist between the story and the photoplay without discrediting the plaintiff's testimony above quoted. We have, of course, nothing to do with the original idea he had in mind, nor with the original conception as to which he testified if they were not incorporated in his story, nor indeed with an idea so incorporated, for it is the author's treatment—the language he uses in the development of the idea that constitutes his literary property, not the idea itself. Without a detailed comparison of the story and the photoplay it is enough to say that the characters, the dialogue, the scenery are all original in the photoplay and differ from the story in substantially every detail. The things in common are the shipwreck, an uninhabited or desert island, the difficulties of life there, and the love story between a poor boy and a rich girl. The plaintiff disclaimed any originality in these points which are similar, as well he might.[1] I quote from his testimony in that regard as follows:

"I can't remember any situation such as the shipwreck, love affair, building a house, any situation which I claim to be original with me. There is a series of incidents in the story; there is a series of incidents in the picture; sometimes dissimilar, sometimes similar. I would say that the shipwreck is not original with me, of course, nor the love affair as such. This is a specific love affair between two characters who have been characterized as a poor boy and an heiress, and so forth. As regards incidents on the island, that is a group of incidents, too, and originality as to such incidents would be the manner in which they were handled. Certainly, I don't claim building a lean-to, building a house, is an original incident. I don't think there is any incident in the picture of life on

---

[1] In this view he is corroborated by the appellant's witness Garland Greever, a professor of English at the University of Southern California: " * * * the similarities are in matters of a general nature. They are not peculiar to the picture or to the script. * * * they had been used many times."

that island, as an individual incident, that was original with me."

In my opinion there was no substantial evidence to go to the jury to show that the photoplay was based upon the plaintiff's story so that he was entitled to screen credit therefor as its author under his contract. Conclusions or opinion evidence tending to sustain the plaintiff's contention must fail in the teeth of the specific evidence furnished by a comparison of the actual story with the photoplay produced.

### Damages.

If we assume there has been a breach of contract, there is no evidence of loss or damage proximately resulting therefrom. The evidence leaves the damages to be determined by the jury by guess and speculation. The burden is upon the plaintiff to establish, not only the breach of the contract, but the damages, if any, proximately resulting therefrom, and, unless he has shown such damage, he is not entitled to recover.[2] It is clear that the contract for screen credit is in effect a contract to advertise the fact that the plaintiff was the author of the story reproduced on the screen. It seems clear that the damages he seeks in this action and the damages awarded are speculative in the absence of some proof as to special damages resulting from the breach of the contract. While the point seems self-evident, we are not without authority on the proposition that damages resulting from failure to advertise are speculative and that in the absence of some specific proof of damage plaintiff cannot recover. I refer without discussion to two or three of these authorities cited by the appellant: Stevens v. Yale, 113 Mich. 680, 72 N.W. 5; Tribune Co. v. Bradshaw, 20 Ill.App. 17; Winston Cigarette Mach. Co. v. Wells, etc., Co., 141 N.C. 284, 53 S.E. 885, 8 L.R.A.(N.S.) 255.

The plaintiff's contention is that, if his reputation had been enhanced by the advertisement that he had produced the story upon which the screen play was based, it would have been an advantage to him in securing other contracts of a similar nature and upon that hypothesis introduced evidence as to a past contract in which he had sold a story for less with screen credit than he had received for another story without screen credit. In the main opinion it is suggested that this evidence is not only pertinent to the inquiry but is a proper basis for determining damage. While it is manifest that favorable publicity of any kind in connection with the production of a screen play would be valuable to one seeking to sell a story or play, it is clear it would be impossible to measure the value of one story by the amount paid for an entirely different story even though the author is the same. There is no basis for comparison, and to permit the jury to determine the value of one play with or without screen credit by evidence of the value of another and entirely dissimilar play would evidently require the jury to enter the domain of speculation. The same thing may be said concerning the evidence referred to in the main opinion concerning the salary received by the plaintiff before and after he had obtained screen credit. There is no evidence that the increase in salary was due to the fact that screen credit had been given on a previous play. I think this evidence was too remote and speculative and should not have been received and that the conclusion of the jury from such evidence was based upon speculation and guess and not upon evidence.

There are other authorities which support the conclusion that in an action for damages for breach of contract the plaintiff cannot recover for loss of profits which he expected to acquire by reason of entering into other contracts which he claims to have been unable to do because of the

---

[2] This is a California contract and governed by the law of California.

The California Civil Code with relation to damages for breach of contract is as follows:

"Sec. 3300. For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.

"Sec. 3301. No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin."

Section 3358 of the California Civil Code provides:

"Notwithstanding the provisions of this chapter, no person can recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides."

breach of the contract. The appellant cites a number of cases in support of this general proposition, among them, Seymour v. McCormick, 16 How. (57 U.S.) 480, 14 L. Ed. 1024; Cincinnati Siemens-Lungren Gas Co. v. Western Siemens-Lungren Co., 152 U.S. 200, 14 S.Ct. 523, 38 L.Ed. 411; Broadway Photoplay Co. v. World Film Corp., 225 N.Y. 104, 121 N.E. 756, 757; and Parke v. Frank, 75 Cal. 364, 17 P. 427. The decision in Broadway Photoplay Co. v. World Film Corporation was written by Judge Cardozo for the New York Court of Appeals. As it emphasizes the impossibility of comparing two dissimilar things as a basis for recovery of damages, I quote from the opinion as follows:

"The comparison must be between feature pictures of the first run and feature pictures of later runs. The jury were so charged. They were charged that the plaintiff was 'limited to the difference in value between first run feature pictures and second or third run feature pictures, and not to the difference between feature pictures and other pictures.' But there is nothing in the evidence to supply a basis for the comparison. No law of averages, no constant or approximate uniformity of returns, can be gathered by induction from the sporadic and varying instances scattered through this record. The pictures of the first run are few in number. They disclose no semblance of equality in their returns when compared with one another. They disclose a like diversity when compared with pictures of later runs. * * *

"There can be no stable foundation for a verdict that is built on such assumptions. Nothing but guesswork can place the damages at $4,500, or any other fixed amount."

In the case of Bernstein v. Meech, 130 N.Y. 354, 29 N.E. 255, 257, defendant, the owner of a theater, contracted with plaintiff to bring a theatrical company to Buffalo to present four performances in defendant's theater. The parties were to share equally in the gross receipts. Plaintiff sued the defendant for breach of this contract. Plaintiff sought to recover his lost profits. This was denied him in the lower court, and he appealed. It was held that such profits were too speculative to be recovered in an action for breach of contract, the court stating, in part, as follows: "The value of the contract to the plaintiff was in the profits and in the amount of them which may have been realized over his expenses attending its performance. Those profits, not being susceptible of proof, were not the subject of recovery."

In a somewhat similar case, Todd v. Keene, 167 Mass. 157, 45 N.E. 81, the court said: "There are too many elements of uncertainty and conjecture to make it safe to rely upon opinions such as the plaintiff offered to give."

It follows that the jury should have been instructed to return a verdict in favor of the defendant because no breach of contract was proved and because no damages were proved.

The defendant also complains of an instruction by which the court informed the jury of the life expectancy of the plaintiff and instructed the jury that if in their judgment this life expectancy was relevant they should consider it in arriving at their verdict. Such an instruction might be considered harmless in some cases because a jury is presumed to know, that is, to take judicial notice of, the life expectancy of an individual, and, it may be assumed, will apply this knowledge to any problem submitted to it where it is deemed by the jury to be germane to the solution. But the life expectancy of the plaintiff had no relation to the problem presented to this jury. They were to award such damages as the plaintiff had suffered up to the time of trial, or reasonably certain to result in the future. The court seemed to be of the impression that the failure to advertise the plaintiff in accordance with the terms of the contract may have permanently decreased his earning power and that such decreased earning power might be considered in arriving at a verdict. This was a direct invitation to the jury to speculate on the future possibilities of the defendant's earning capacity and upon the question of whether or not it would be affected by the defendant's breach of the contract. There was and could be no proof that he was permanently injured. As a matter of fact the evidence shows that the plaintiff abandoned his efforts in the moving picture line and withdrew from the field and devoted his time to writing a novel. Although he testified that he intended at some time to return to Hollywood for the purpose of engaging as an author in the moving picture industry, the testimony as

to his change of occupation increases the speculative character of the jury's verdict based upon hypothetical losses due to a failure to secure contracts in the moving picture industry.