[Civ. No. 66492. Second Dist., Div. Five. Apr. 28, 1983.]

TAMARIND LITHOGRAPHY WORKSHOP, INC., et al.,
Plaintiffs, Cross-defendants and Respondents, v.
TERRY SANDERS et al., Defendants, Cross-complainants and Appellants.

**COUNSEL**

Don Erik Franzen for Defendants, Cross-complainants and Appellants.

Ball, Hunt, Hart, Brown & Baerwitz, Stephen A. Cirillo and Clarence S. Hunt for Plaintiffs, Cross-defendants and Respondents.

**OPINION**

**STEPHENS, J.**—The essence of this appeal concerns the question of whether an award of damages is an adequate remedy at law in lieu of specific performance for the breach of an agreement to give screen credits. Our saga traces its origin to March of 1969, at which time appellant, and cross-complainant below, Terry Sanders (hereinafter Sanders or appellant), agreed in writing to write, direct and produce a motion picture on the subject of lithography for

respondent, Tamarind Lithography Workshop, Inc.[1] (hereinafter referred to as Tamarind or respondent).[2]

Pursuant to the terms of the agreement, the film was shot during the summer of 1969, wherein Sanders directed the film according to an outline/treatment of his authorship, and acted as production manager by personally hiring and supervising personnel comprising the film crew. Additionally, Sanders exercised both artistic control over the mixing of the sound track and overall editing of the picture.

After completion, the film, now titled "Four Stones for Kanemitsu," was screened by Tamarind at its 10th anniversary celebration on April 28, 1970. Thereafter, a dispute arose between the parties concerning their respective rights and obligations under the original 1969 agreement. Litigation ensued and in January 1973 the matter went to trial. Prior to the entry of judgment, the parties entered into a written settlement agreement, which became the premises for the instant action. Specifically, this April 30, 1973, agreement provided that Sanders would be entitled to a screen credit entitled "A Film by Terry Sanders."

Tamarind did not comply with its expressed obligation pursuant to that agreement, in that it failed to include Sanders' screen credits in the prints it distributed. As a result a situation developed wherein Tamarind and codefendant Wayne filed suit for declaratory relief, damages due to breach of contract, emotional distress, defamation and fraud.

Sanders cross-complained, seeking damages for Tamarind's breach of contract, declaratory relief, specific performance of the contract to give Sanders screen credits, and defamation. Both causes were consolidated and brought to trial on May 31, 1977. A jury was impaneled for purposes of determining damage issues and decided that Tamarind had breached the agreement and awarded Sanders $25,000 in damages.[3]

The remaining claims for declaratory and injunctive relief were tried by the court. The court made findings that Tamarind had sole ownership rights in the

---

[1]Terry Sanders as well as the Terry Sanders Company were both originally named as codefendants and later became cocomplainants in this action. For the purposes of our discussion, references to Terry Sanders are intended as references to both Terry Sanders and the Terry Sanders Company.

[2]Respondent June Wayne, as the president of respondent Tamarind, was responsible for entering into the agreement on behalf of that company and is also to be included in all references to respondent Tamarind.

[3]The jury was asked to decide both Sanders' claim for breach of contract, as well as Tamarind's and Wayne's claim for contract breach, emotional distress, defamation and fraud. Tamarind was nonsuited on its emotional distress and defamation claim, and also received unfavorable verdicts respecting its breach of contract claim and fraud claim.

film, that "both June Wayne and Terry Sanders were each creative producers of the film, that Sanders shall have the right to modify the prints in his personal possession to include his credits." All other prayers for relief were denied.

It is the denial of appellant's request for specific performance upon which appellant predicates this appeal.

Since neither party is contesting the sufficiency of Sanders' $25,000 jury award for damages,[4] the central issue thereupon becomes whether that award is necessarily preclusive of additional relief in the form of specific performance, i.e., that Sanders receive credit on all copies of the film. Alternately expressed, the issue is whether the jury's damage award adequately compensates Sanders, not only for injuries sustained as a result of the prior exhibitions of the film without Sanders' credits, but also for future injuries which may be incurred as a result of any future exhibitions of the film without his credit. Commensurate with our discussion below, we find that the damages awarded raise an issue that justifies a judgment for specific performance. Accordingly, we reverse the judgment of the lower court and direct it to award appellant the injunctive relief he now seeks.

Our first inquiry deals with the scope of the jury's $25,000 damage award. More specifically, we are concerned with whether or not this award compensates Sanders not only for past or preexisting injuries, but also for future injury (or injuries) as well.

Indeed, it is possible to categorize respondent's breach of promise to provide screen credits as a single failure to act from which all of Sanders' injuries were caused. However, it is also plausible that damages awarded Sanders were for harms already sustained at the date of trial, and did not contemplate injury as a result of future exhibitions of the film by respondent, without appropriate credit to Sanders.

Although this was a jury trial, there are findings of facts and conclusions of law necessitated by certain legal issues that were decided by the court. Finding of fact No. 12 states:

"By its verdict the jury concluded that Terry Sanders and the Terry Sanders Company are entitled to the sum of $25,000.00 in damages for all damages suffered by them arising from Tamarind's breach of the April 30th agreement." The exact wording of this finding was also used in conclusion of law No. 1. Sanders argues that use of the word "suffered" in the past tense is positive

---

[4]Respondent Tamarind concedes this fact in its brief by asserting that appellant's remedy at law (the $25,000 damage award) is adequate.

evidence that the jury assessed damages only for breach of the contract up to time of trial and did not award possible future damages that might be suffered if the film was subsequently exhibited without the appropriate credit. Tamarind, on the other hand, contends that the jury was instructed that if a breach occurred the award would be for *all* damages past and future arising from the breach. The jury was instructed: "For the breach of a contract, the measure of damages is the amount which will compensate the party aggrieved, for the economic loss, directly and proximately caused by the breach, or which, in the ordinary course of things, would be likely to result therefrom" and ". . . economic benefits including enhancement of one's professional reputation resulting in increased earnings as a result of screen credit, if their loss is a direct and natural consequence of the breach, may be recovered for breach of an agreement that provides for screen credit. Economic benefits lost through breach of contract may be estimated, and where the plaintiff [Tamarind], by its breach of the contract, has given rise to the difficulty of proving the amount of loss of such economic benefit, it is proper to require of the defendant [Sanders] only that he show the amount of damages with reasonable certainty and to resolve uncertainty as to the amount of economic benefit against the plaintiff [Tamarind]."

The trial court agreed with Tamarind's position and refused to grant the injunction because it was satisfied that the jury had awarded Sanders all the damages he was entitled to including past and possible future damages. The record does not satisfactorily resolve the issue. However, this fact is not fatal to this appeal because, as we shall explain, specific performance as requested by Sanders will solve the problem.

■ The availability of the remedy of specific performance is premised upon well established requisites. These requisites include: A showing by plaintiff of (1) the inadequacy of his legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract. (See *Henderson* v. *Fisher* (1965) 236 Cal.App.2d 468, 473 [46 Cal.Rptr. 173], and Civ. Code, §§ 3384, 3386, 3390, 3391.)

■ It is manifest that the legal remedies available to Sanders for harm resulting from the future exhibition of the film are inadequate as a matter of law. The primary reasons are twofold: (1) that an accurate assessment of damages would be far too difficult and require much speculation, and (2) that any future exhibitions might be deemed to be a continuous breach of contract and thereby create the danger of an untold number of lawsuits.

There is no doubt that the exhibition of a film, which is favorably received by its critics and the public at large, can result in valuable advertising or publicity for the artists responsible for that film's making. Likewise, it is unquestionable that the nonappearance of an artist's name or likeness in the form of screen credit on a successful film can result in a loss of that valuable publicity. However, whether that loss of publicity is measurable dollar wise is quite another matter.

By its very nature, public acclaim is unique and very difficult, if not sometimes impossible, to quantify in monetary terms. Indeed, courts confronted with the dilemma of estimating damages in this area have been less than uniform in their disposition of same. Nevertheless, it is clear that any award of damages for the loss of publicity is contingent upon those damages being reasonably certain, specific, and unspeculative.[5] (See *Ericson* v. *Playgirl, Inc.* (1977) 73 Cal.App.3d 850 [140 Cal.Rptr. 921, 96 A.L.R.3d 427].)

The varied disposition of claims for breach of promise to provide screen credits encompasses two schools of thought. On the one hand, there is the view that damages can be ascertained (to within a reasonable degree of certainty) if the trier of fact is given sufficient factual data. (See *Paramount Productions, Inc.* v. *Smith* (9th Cir. 1937) 91 F.2d 863, cert. den. 302 U.S. 749 [82 L.Ed. 579, 58 S.Ct. 266].) On the other hand, there is the equally strong stance that although damages resulting from a loss of screen credits might be identifiable, they are far too imponderable and ethereal to define in terms of a monetary award. (See *Poe* v. *Michael Todd Co.* (S.D.N.Y. 1957) 151 F.Supp. 801.) If these two views can be reconciled, it would only be by an independent examination of each case on its particular set of facts.

In *Paramount Productions, Inc.* v. *Smith, supra,* 91 F.2d 863, 866-867, the court was provided with evidence from which the ". . . jury might easily compute the advertising value of the screen credit." (*Id.,* at p. 867.) The particular evidence presented included the earnings the plaintiff/writer received for his work on a previous film in which he did not contract for screen credits. This evidence was in turn easily compared with earnings that the writer had received for work in which screen credits were provided as contracted. Moreover, evidence of that artist's salary, prior to his receipt of credit for a play when compared with earnings received subsequent to his actually receiving credit, was ". . . if believed, likewise sufficient as a gauge for the measure of damages." (*Id.,* at p. 867.)

---

[5] California codifies this doctrine in section 3301 of the Civil Code which provides in pertinent part: "No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin."

In another case dealing with a request for damages for failure to provide contracted-for screen credits, the court in *Zorich* v. *Petroff* (1957) 152 Cal.App.2d 806 [313 P.2d 118] demonstrated an equal awareness of the principle. The court emphasized ". . . that there was no evidence from which the [trial] court could have placed a value upon the screen credit to be given plaintiff as an associate producer. (Civ. Code, § 3301.)" (*Id.*, at p. 811.) Incident to this fact, the court went on to surmise that because the motion picture which was at the root of the litigation was an admitted financial failure, screen credit, if given, ". . . could reasonably have been regarded as a detriment to him." (*Id.*, at p. 811.)

At the other extreme, it has been held that failure to give an artist screen credit *would* constitute irreparable injury. In *Poe* v. *Michael Todd Co.*, *supra*, 151 F.Supp. 801, the New York district court was similarly faced with an author's claim that his contractual right to screen credit was violated. The court held: "Not only would money damages be difficult to establish, but at best they would hardly compensate for the real injury done. A writer's reputation, which would be greatly enhanced by public credit for authorship of an outstanding picture, is his stock in trade, it is clear that irreparable injury would follow the failure to give screen credit if in fact he is entitled to it." (*Id.*, at p. 803.)

Notwithstanding the seemingly inflexible observation of that court as to the compensability of a breach of promise to provide screen credits, all three cases equally demonstrate that the awarding of damages must be premised upon calculations, inferences or observations that are logical. Just how logical or reasonable those inferences are regarded serves as the determining factor. Accordingly, where the jury in the matter sub judice was fully apprised of the favorable recognition Sanders' film received from the Academy of Motion Picture Arts and Sciences, the Los Angeles International Film Festival, and public television, and further, where they were made privy to an assessment of the value of said exposure by three experts,[6] it is reasonable for the jury to award monetary damages for that ascertainable loss of publicity. However, pecuniary compensation for Sanders' future harm is not a fully adequate remedy. (See Rest., Contracts, § 361, p. 648.)

We return to the remaining requisites for Sanders' entitlement to specific performance. The need for our finding the contract to be reasonable and supported by adequate consideration is obviated by the jury's determination of respondent's breach of that contract. The requisite of mutuality of remedy has been satisfied in that Sanders had fully performed his obligations pursuant to the agreement (i.e., release of all claims of copyright to the film and dismissal of

---

[6]Those experts all rendered opinions that publicity received by someone with the credit "A film by" for a documentary similar to appellant's, which received similar honors, could be quantified in monetary terms between $50,000 and $150,000.

his then pending action against respondents). (See Civ. Code, § 3386.) Similarly, we find the terms of the agreement sufficiently definite to permit enforcement of the respondent's performance as promised.

In the present case it should be obvious that specific performance through injunctive relief can remedy the dilemma posed by the somewhat ambiguous jury verdict. The injunction disposes of the problem of future damages, in that full compliance by Tamarind moots the issue. Of course, violation of the injunction by Tamarind would raise new problems, but the court has numerous options for dealing with the situation and should choose the one best suited to the particular violation.

In conclusion, the record shows that the appellant is entitled to relief consisting of the damages recovered, and an injunction against future injury.[7]

Subsequent to the initial filing of this opinion, it was brought to this court's attention that Terry Sanders entered into a settlement agreement which it is alleged may have a mooting effect on the instant action.

The subject agreement, which was executed approximately one day after the initial posting of this opinion, is assertedly a general release from liability of both respondents and various insurance companies for both the instant action and a related action not a part of this appeal. Respondents submit that the import of the agreement, which is captioned "FULL RELEASE OF ALL CLAIMS," is to make the instant action moot, thus disposing of the issues before this court. Accordingly, respondents petitioned this court to dismiss the instant appeal or alternatively allow them to produce evidence in addition to their supporting declarations.

In opposition to respondents' request, appellants (Terry Sanders and the Terry Sanders Company) submit, by way of opposition declarations, that the subject settlement agreement did not in any way act as a release of their asserted rights to screen credits which comprise the core of this appeal. Specifically, appellants argue that the agreement only states that its effect is to release and discharge respondents from the *monetary* judgment in the instant action and makes no mention whatsoever concerning this appeal or the rights to screen credits. Appellants suggest by way of argument supported by documentation that said agreement was the product of negotiations in which appellants specifically made known that the agreement was not to affect or otherwise encompass the right to specific performance of the agreement to provide the screen credits involved in this appeal.

---

[7]Contrary to respondent's position, this disposition is not inconsistent with prevailing California authority. (See *Lemat Corp.* v. *Barry* (1969) 275 Cal.App.2d 671, 679 [80 Cal.Rptr. 240], and *Harvey* v. *White* (1963) 213 Cal.App.2d 275, 282 [28 Cal.Rptr. 601].)

Considering the extent of this controversy, in conjunction with our decision to reverse the judgment below, we think it in the best interests of all parties concerned for the trial court to determine what effect, if any, the agreement should have on the action. In effect, respondents' petition is tantamount to a motion to dismiss the entire action, as opposed to the mere dismissal of this appeal. It would appear that the trial court is the more appropriate forum to receive evidence and adjudicate the merits of this issue. If it were to reach a determination unfavorable to petitioners, it would be in position to grant the relief we have determined appellants are entitled to. On the other hand, a contrary determination by the trial court would still leave that court with the authority to take the action requested by petitioners.

The judgment denying appellants' prayer for injunctive relief is hereby reversed and the action, with the addition of this new issue, is remanded to the trial court to take appropriate action in conformity with the views expressed in this opinion, including the taking of additional evidence, oral or written, if deemed appropriate, on the motion to dismiss.

Feinerman, P. J., and Hastings, J., concurred.

A petition for a rehearing was denied May 26, 1983.