The WELLNESS COMMUNITY–NATIONAL, a California not-for-profit, charitable corporation, Plaintiff,

v.

WELLNESS HOUSE f/k/a The Wellness Community Chicago–Western Suburbs, an Illinois not-for-profit, charitable corporation, Defendant.

No. 93 C 7019.

United States District Court,
N.D. Illinois,
Eastern Division.

June 29, 1995.

James H. Ryan, Jeffrey Alan Zaluda, Michael Scott Friman, Horwood, Marcus & Braun, Chicago, IL, for plaintiff.

Lillian K. Miller, Mayer, Brown & Platt, Chicago, IL, Patrick W. O'Brien, Chicago, IL, for defendant.

### MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

On November 17, 1993, The Wellness Community–National ("Wellness C") sued The Wellness Community Chicago–Western Suburbs ("Wellness H"), alleging breach of contract. Between July 18 and 20, 1994, we held a bench trial. On August 5, 1994, Wellness C and Wellness H each submitted proposed findings of fact and conclusions of law ("FF & CL"). Pursuant to Fed.R.Civ.P. 52, we make our own findings and conclusions, which we discuss below.

### FINDINGS OF FACT

*I. Background*

Established in 1982, Wellness C is a California not-for-profit, charitable corporation with its principle place of business in Santa Monica, California. Trans. at 29. It provides "free psycho-social support to adults with cancer as an adjunct to conventional medical treatment." Amend. Compl. at ¶ 1; Pl.Ex. 12. In other words, according to one of its brochures, it "is a place where people with cancer learn to join with their physicians and other health care professionals rather than acting as hopeless, helpless, passive victims of the illness." Pl.Ex. 12. Wellness C and its affiliates have provided support to over 25,000 people. *Id.* As of October 20, 1993, it had affiliates in numerous California locations, plus in St. Louis, Cincinnati, Boston, Philadelphia, Baltimore, and Knoxville. Pl.Ex. 27. For its good deeds, it has received extensive international and na-

tional publicity. Trans. 47–50. Participants and donors "by and large refer to it as Wellness." Trans. at 45.

On July 13, 1989, Wellness C entered into a Charter Agreement ("Agreement") with the then The Wellness Community Chicago–Western Suburbs ("Wellness C CWS"). By signing the Agreement, Wellness C CWS "agree[d] that its sole purpose [was] to carry out The Wellness Community program ... in the Western Suburban area of Chicago, Illinois ..., in accordance with the 'General Guidelines.' " Pl. Ex 1 at § 1. Those Guidelines provide that "[i]nasmuch as [Wellness C] has established a reputation for integrity, service and effectiveness, it is concerned that no organization chartered by it do anything which would impair such reputation. Therefore, in addition to the foregoing provisions of this [Agreement], [Wellness C CWS] agrees to model all of its activities upon the guidelines and standards promulgated from time to time by [Wellness C]. ..." Pl. Ex 1 at § 14. The Guidelines also provide that, in return, Wellness C would contribute "train[ing]", "assist[ance]", "suppl[ies]", "advertis[ing]", and other support to Wellness C CWS. Pl.Ex. 1 at § 3.

In this case, however, the central provision is Section 8:

[T]his [Agreement] may be revoked by [Wellness C] or terminated by [Wellness C CWS] for any reason whatsoever upon giving ninety (90) days written notice. It is agreed that any termination of this [Agreement] shall be deemed a revocation of the [Agreement] by [Wellness C]. Immediately upon giving notice or receiving notice of revocation, [Wellness C CWS] shall take all steps so that the words "The Wellness Community" and all similar words which might prove confusing to the public shall be deleted from all of [Wellness C CWS's] activities of any and all types and kinds, and [Wellness C CWS] shall immediately take all steps as are necessary so that all persons will know that [Wellness C CWS] is no longer associated with [Wellness C] and, from that point in time on, neither [Wellness C CWS] nor anyone associated with [Wellness C CWS] shall under any

circumstances indicate that it is affiliated in any way with [Wellness C]....

Pl.Ex. 1.

After signing the Agreement, Wellness C CWS began operations as an Illinois not-for-profit, charitable corporation with its principle place of business in Hinsdale, Illinois. As it operated, the local community became increasingly aware of its name. Trans. at 261–70. In fact, a series of surveys shows that the community's awareness rose from "something like 41 and a half percent" in 1991 to "something apparently in the mid to upper 50s" in 1993. Trans. at 264, 269. During those years, under the name Wellness C CWS, it received $2,700,000 in donations. Ans. to Amend. Compl. at 12.

Yet in July and August 1993, Wellness C CWS had "[s]erious discussion[s] at the board level" about disaffiliating from Wellness C. Trans. at 172. Then, in an October 4, 1993, letter, Wellness H informed Wellness C of its desire to disaffiliate, writing that it "hereby terminates The [Agreement] effective 90 days following your receipt of this notification." Pl.Ex. 19. "A principle reason for Wellness [H's] decision to terminate its affiliation with [Wellness C] was the firm position of [Dr. Harold] Benjamin[1] that there is only one way to measure the success or failure of the Wellness Community Program." Def. Prop. FF & CL at 10–11. Wellness H considered "[Wellness C's] measure of success ... to be 'irresponsible.'" Id. at 11. Wellness H "firm[ly] belie[ved] that [it] could provide a better program for its participants only if its program was subject to outside assessment." Id.

In its October 4 letter, Wellness H wrote that it "is proceeding with the necessary steps to comply with the provisions of Section 8 of The [Agreement]." Pl.Ex. 19. In its October 6, 1993, response letter, Wellness C wrote that it "wish[ed] [Wellness H] the best of luck" and was "sure that [Wellness H] w[ould] take all the 'steps' provided for in [Section] 8 as soon as possible." Pl.Ex. 20.

The steps included the renaming process. Actually, Wellness H initiated that process before it announced its desire to disaffiliate. At six or seven meetings beginning in September 1993, Wellness H brought together "representatives of [its] constituent base, [its] board, [its] other volunteer groups, staff, throughout [its] constituencies" to develop a new name. Trans. at 175. At those meetings, Mr. William Walker, the Executive Director of Wellness H, raised the issue that, given the Agreement's Section 8, the words "wellness" and "community" might not be legal options. Trans. at 176. Moreover, he "probably" suggested that the group not even consider the word "wellness". Trans. at 176. When the group developed names that included "wellness" or "community," "people would throw [them] out and say that's a natural follower or something." Trans. at 178.

At the meetings, the group expressed its desire for Wellness H to be separate from Wellness C, but potential public "[c]onfusion [over the separation] was never an issue." Trans. at 180. On direct examination, counsel asked if, "in any of these conversations with Mr. [A. William] Haarlow[2] or with any of these other groups, did you discuss the question of whether using the word 'wellness' might be confusing?" Trans. at 180. Mr. Walker responded that "[w]e did not discuss that. I think our plan to separate included intense face-to-face interaction with all our constituencies and written material to a number of others with follow-up phone calls. And we were clear that we were going to make it clear that we had left The Wellness Community National." Trans. at 180. The renaming group developed "somewhere between 300 and 400 possib[le] [names]." Trans. at 178.

Also in September 1993, Wellness C budgeted a certain amount of money for public relations purposes. The goal of its public relations campaign was for it "[to] be recognized nationally in the lay and professional communities as the expert in the area of psycho[social] support of cancer patients." Trans. at 158. More specifically, "[t]he goal was ... to raise $11 and a half million to

---

1. The President of Wellness C. Trans. at 29.

2. The Chairman of the Board of Wellness H. Trans. at 260.

open 50 facilities." Trans. at 158. Even more specifically, the goal "include[d] the establishment of a new The Wellness Community facility within the Chicagoland area within the next five years, to be funded in part by [Wellness C], but in large part by donations raised in the Chicagoland area." Amend. Compl. at 4; *see* Trans. at 159. By July 1994, Wellness C was "paying $5000 a month" on its public relations campaign, although the campaign did not yet target the Chicago area. Trans. at 159.

No later than October 18, 1993, Wellness C CWS adopted "Wellness H" as its official post-disaffiliation name. Pl.Ex. 25. In an October 22, 1993, letter, Wellness C informed Wellness H that "use of [Wellness H] specifically violates [Section 8] and will be confusing to the public in general and cancer patients in particular." Pl.Ex. 28. On November 17, 1993, Wellness C brought this suit.

At trial, Mr. Benjamin testified:

I am worried—we are all worried that since we have no oversight of [Wellness H] that we will be constantly concerned les[t] they provide a program which would somehow—with people who think that they are still part of our organization would believe that they represent us. I am very concerned about that.... I must tell you, [opposing counsel], if the fact that they have our name helps them get cancer patients, I don't care about that. This isn't McDonald's. What I care about terribly is that they will do something that will impugn our name, that they will do something outside of what we consider the best way to treat cancer patients. I am not saying what they would do would be worse, it would just not be ours. It would in some way dilute our situation, and that's what we are worried about. We—they wanted to leave us, and we are satisfied. We want to help them with that. All we ask is don't use our name. "Don't confuse people...."

Trans. at 162–3 (paragraphs omitted).

## CONCLUSIONS OF LAW

### II. Jurisdiction

"[T]he supplemental jurisdiction statute, 28 U.S.C. § 1367(a), ... extends the jurisdiction of federal district courts to all claims that are sufficiently related to the claim or claims on which their original jurisdiction is based to be part of the same case or controversy within the meaning of Article III of the Constitution." *Wright v. Assoc'd Ins. Cos., Inc.*, 29 F.3d 1244, 1250 (7th Cir. 1994). "The supplemental jurisdiction statute codified judge-made principles of pendent jurisdiction. Pendant jurisdiction is a doctrine of discretion." *Id.* at 1251 (citations omitted). "In the usual case in which all federal claims are dismissed before trial, the balance of ... factors will point to declining to exercise jurisdiction over any remaining pendent state-law claims." *Id.* (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)). "There are, however, unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness and comity—will point to federal decision of the state-law claims on the merits." *Id.*

The *Wright* court provided three broad examples of "unusual cases." *Id.* One example "occurs when 'substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort.'" *Id.* (quoting *Graf v. Elgin, Joliet & E. Ry. Co.*, 790 F.2d 1341, 1347–8 (7th Cir.1986)). The "exception for judicial [resources] derives from *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), where the Supreme Court ... emphasized the 'common-sense policy' of pendent jurisdiction—conservation of judicial energy and the avoidance of multiplicity of litigation." *Id.* (quoting *Rosado*, 397 U.S. at 405, 90 S.Ct. at 1214).

At what point has a court committed substantial resources? It remains "the practice for district judges in the exercise of their discretion to relinquish a pendent claim or suit if the main claim [is] dismissed before trial ... but to retain the pendent claim if the claim conferring federal jurisdiction [is] dismissed after the case [is] tried, in order to save the parties the expense of having to try the pendent claim twice." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176,

1182 (7th Cir.1993); *see Wright,* 29 F.3d at 1250 (stating the "general rule"). This practice, however, is "[ ]flexible". *Id.* "Trial is simply a convenient benchmark." *Graf,* 790 F.2d at 1348.

■ In this case, Wellness C originally alleged violations of 15 U.S.C. § 1125(a), so we had federal question jurisdiction over the suit. *See* Compl., Count II. Wellness C also alleged breach of contract arising out of the same case or controversy, so we had pendent jurisdiction over that. *See* Compl., Count I. On April 20, 1994, however, the parties submitted an "agreed motion to dismiss Counts II, III, IV, V and VI of the Complaint and the counterclaim for declaratory judgment." And on April 21, they submitted a "joint motion for entry of order," which provided in part:

> Plaintiff and defendant, jointly, hereby move the Court for entry of an Order, ... the purpose of which is to implement the agreement of the parties for a procedure to promptly dispose of this matter in this Court based on.... Count I of the Complaint....

*Id.* at 1.

On June 7, we granted the substance of their agreed motion; we allowed Wellness C to withdraw Counts II–VI and Wellness H to withdraw its counterclaim.[3] On June 30, Wellness C confused the matter by filing an Amended Complaint, alleging only breach of contract and claiming only diversity jurisdiction. On July 7, Wellness H answered the Amended Complaint and suggested that we no longer had jurisdiction because Wellness C could not satisfy the amount in controversy requirement. Ans. to Amend. Compl. at 4. Wellness H did not move to dismiss or for summary judgment. Between July 18 and 20, we held the bench trial.

In this case, then, we allowed Wellness C to withdraw the "main claim" before trial,

but we held the trial anyway. What here? We consider the *Wright* factors. First, regardless of whether we should have held the trial, we now have committed substantial judicial resources.[4] Second, regardless of whether we should have held the trial, if we now relinquish jurisdiction, the parties will have the expense of trying the pendant claim twice. Third, Wellness C and Wellness H agreed to streamline their litigation before us in the interest of justice and cancer patients. It would be unfair to allow Wellness H to promote such an agreement and then prevail on a jurisdictional argument, particularly one it fully made only after we held the trial. Fourth, the contract claim involves California law. The Illinois courts have limited interest in resolving a dispute that involves another state's law. This is an unusual case. We exercise our discretion and hold that we retain supplemental jurisdiction over the state law contract claim.[5]

### III. Contract

#### A. Choice of Law

The Agreement provides that "[it] shall be governed in all respects by the laws of ... California." *Id.* at § 17(a). We respect the Agreement's provision and apply the laws of that state.

#### B. Liability

■ Did Wellness H breach the Agreement's Section 8? To determine whether it did, we interpret that Section. " 'The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.' " *Bunnett v. Regents of Univ. of Cal.,* 35 Cal. App.4th 843, 851, 41 Cal.Rptr.2d 567 (1995) (quoting Civ.Code § 1638). " 'The words of a contract are to be understood in their ordinary and popular sense.' " *Id.* (quoting Civ. Code § 1644); *see Hunt Wesson Foods, Inc. v. Supreme Oil Co.,* 817 F.2d 75, 77 (9th

---

**3.** On April 21, we denied their joint motion.

**4.** We recognize that this point may become circular if federal courts consider it prospectively. In this case, however, the parties did not fully argue the jurisdictional issue until after trial, and we did not fully analyze it until then. We consider the point retrospectively.

**5.** In any event, we likely have diversity jurisdiction. *See Seagram–Distillers Corp. v. New Cut Rate Liquors, Inc.,* 245 F.2d 453 (7th Cir.), *cert. denied,* 355 U.S. 837, 78 S.Ct. 61, 2 L.Ed.2d 48 (1957); *Snap–On Tools Corp. v. Winkenweder & Ladd, Inc.,* 250 F.2d 154 (7th Cir.1957).

Cir.1987) (stating that "[a] primary rule of interpretation is that '[t]he common or normal meaning of language will be given to words in a contract unless circumstances show that in a particular case a special meaning should be attached to it'"). The words are also to be understood in the context of the whole contract. *Id.; see* Civ.Code § 1641.

■ In this case, the language of the contract governs, and we give the language its common or normal meaning. Section 8 provides that, once Wellness H disaffiliates, it must exclude from its activities the words "The Wellness Community" and "all similar words which might prove confusing to the public." One analytical approach is to dissect the Section's terms and consider the meanings and parameters of each. What words are "similar" to "Wellness" and "Community"? Does "might prove" require an extensive showing? Does it require a more extensive showing because it is "might prove" instead of "might be"? What is the threshold level of "confusi[on]"? Who is the "public"? If this were a close case, perhaps we would take that approach.

This, however, is not a close case. In fact, we struggle to generate a name that is more similar to the name Wellness Community and more likely to prove confusing to the public than the name Wellness House. Wellness Commune, maybe? If Section 8 means anything, and we are confident that it means a great deal, it means that the name Wellness House represents a breach of its terms. This is particularly so given several factors. First, the Wellnesses were affiliated for years. Second, people refer to Wellness C by its first name. Third, Wellness C intends to establish another facility in the Chicago area. Fourth, Wellness C also intends to launch a national publicity and fund raising campaign. Considering the Agreement as a whole, which reflects Wellness C's deep concern over the uniqueness and integrity of its name, we interpret Section 8 broadly. Yet even if we interpreted it narrowly, we would find that "Wellness House" represents a breach. Wellness House breached, and it is responsible for the consequences. Wellness

H saw this coming, *see* Trans. at 175–8, so our conclusion should not shock it.

### C. Remedy

#### 1. Injunctive Relief

■ "An injunction to enforce the terms of a contract may only be issued if the contract is specifically enforceable." *Golden West Baseball Co. v. City of Anaheim*, 25 Cal. App.4th 11, 50, 31 Cal.Rptr.2d 378 (4th Dist. 1994) (citing Civ.Code § 3423); *see Thayer Plymouth Ctr. v. Chrysler Motors Corp.*, 255 Cal.App.2d 300, 304, 63 Cal.Rptr. 148 (4th Dist.1967); *see also The S. Christian Leadership Conference of Greater Los Angeles v. Al Malaikah Auditorium Co.*, 230 Cal.App.3d 207, 224, 281 Cal.Rptr. 216 (2nd Dist.1991).

■ Is the contract specifically enforceable? In *Tamarind Lithography Workshop, Inc. v. Sanders*, 143 Cal.App.3d 571, 193 Cal. Rptr. 409 (2nd Dist.1983), the court stated that "[t]he availability of the remedy of specific performance is premised upon well established requisites. These requisites include:"

> A showing by plaintiff of (1) the inadequacy of his legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract.

*Id.* at 575, 193 Cal.Rptr. 409.

■ Does Wellness C satisfy the *Tamarind* requisites? Wellness C's legal remedy is inadequate because "an accurate assessment of damages would be far too difficult and require much speculation, and ... any future [activities] might be deemed to be a continuous breach of contract and thereby create the danger of an untold number of lawsuits." *Tamarind*, 143 Cal.App.3d at 575, 193 Cal.Rptr. 409. Second, the parties do not dispute that the underlying contract is both reasonable and supported by adequate consideration. Third, the parties do not dispute the existence of a mutuality of reme-

dies.[6] Fourth, the contractual terms are sufficiently definite because performance merely "requires [Wellness H] to eliminate 'Wellness' from its name." Pl. Prop. FF & CL at 15. Fifth, the requested performance is substantially similar to that promised in the contract because both involve Wellness H changing its name. Therefore, the contract, at least the part of it on which Wellness C sues,[7] is specifically enforceable.

■ Should we issue a permanent injunction to enforce the terms of the contract? "To qualify for a permanent injunction, the plaintiff must prove (1) the elements of a cause of action involving the wrongful act sought to be enjoined and (2) the grounds for [injunctive] relief...." *City of S. Pasadena v. Dep't of Transp.*, 29 Cal.App.4th 1280, 1293, 35 Cal.Rptr.2d 113 (3d Dist.1994). "[T]he bases for injunctive relief are [inadequacy of legal remedies] and [irreparable injury]. In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1986); *see Multnomah Legal Servs. Workers Union v. Legal Servs. Corp.*, 936 F.2d 1547, 1553 (9th Cir.1991).

■ Does Wellness C satisfy the *Pasadena* requisites? It proved the elements of the cause of action. Wellness H breached the contract. And it proved the inadequacy of legal remedies. *See, supra*, p. 1279. But did it prove irreparable injury? According to the Ninth Circuit, it did not need to. "Once actual success on the merits has been established, 'a party is entitled to relief as a matter of law irrespective of the amount of irreparable injury which may be shown.'"

*Continental Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1104 (9th Cir.1994) (quoting *W. Sys., Inc. v. Ulloa*, 958 F.2d 864, 872 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 970, 122 L.Ed.2d 125 (1993)); *see Multnomah*, 936 F.2d at 1553; *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir.1988) (stating that, once actual success on the merits has been established, "the inquiry is over"); *see also* 11 C. Wright and A. Miller, *Fed. Practice and Procedure*, § 2944, at 401 (1973) (stating that "irreparable injury is not an independent requirement for obtaining a permanent injunction"). In any event, we would likely presume the injury. *See Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, n. 3 (9th Cir.1989). Therefore, Wellness C qualifies for permanent injunctive relief.[8]

How should we phrase the permanent injunction? What language would force Wellness H to comply with the contract yet enable us to monitor its compliance easily and effectively? For the answer, we adopt in part Wellness C's proposal: We order Wellness H to change its name to eliminate the word "Wellness" therefrom, and we prohibit Wellness H from ever using the word "Wellness" in its corporate name and/or business identification.

### 2. Attorneys' Fees and Costs

■ The Agreement provides that "[i]f any action or proceeding is brought by either party to construe or enforce this Agreement and Charter or any provision hereof, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs." Pl.Ex. 1 at § 18. Under California law, such provisions are enforceable. Civ.Code § 1717(a). In this case, Wellness C is the prevailing party, and, therefore, it may recover reason-

---

**6.** Although the *Tamarind* court stated that the remedy is premised on well established requisites, its statement appears overly self-assured in light of other common law that questions the mutuality requisite. *See Bleecher v. Conte*, 29 Cal.3d 345, 213 Cal.Rptr. 852, 698 P.2d 1154 (1981); *Converse v. Fong*, 159 Cal.App.3d 86, 91, 205 Cal.Rptr. 242 (1st Dist.1984). In this case, however, because the parties do not dispute that Wellness C performed its part of the contract, we need not resolve the split in California law.

**7.** In its proposed FF & CL, Wellness C appears to make an issue of Wellness H's transitional activities beyond its renaming. At trial, however, Mr. Benjamin was unconcerned about those activities. Trans. at 134, 162–3. The Amended Complaint echoes the lack of concern. *See* ¶¶ 13–4. In any event, we cannot require Wellness H to specifically perform those activities; it would involve excessive and vague oversight.

**8.** Wellness H claims no injury or significant effect from Wellness C's request for relief. Trans. at 297, 399, 417 and 432.

able attorneys' fees and costs from Wellness H.

*IV. Conclusion*

Based on our findings of fact and conclusions of law, we grant Wellness C's request for injunctive relief and for reasonable attorneys' fees and costs.