Filed 9/26/23  Garcia v. Deutz CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| EFREN GARCIA et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>JOSEPH DANIEL DEUTZ, as Trustee, etc. et al.,<br><br>    Defendants and Appellants. | D080665<br><br><br><br>(Super. Ct. No. 37-2020-00036653-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Haney & Shah, Steven H. Haney, Kenneth W. Baisch, and Kitty Xie for Defendants and Appellants.

Miller, Monson, Peshel, Polacek & Hoshaw, Timothy P. Kindelan, and Erika P. Sanchez, for Plaintiffs and Respondents.

Ines and Efren Garcia (together Respondents)[1] entered into a written agreement with their former employer, Paul L. Deutz, Jr.,[2] in his individual capacity and as trustee of the Papa Delta Trust (Trust). The subject agreement concerned Respondents' retirement plan and required the Trust to make certain monthly payments to them. After Paul Jr. passed away, the Trust ceased making payments under the agreement.

Respondents filed a breach of contract action against Joseph Daniel Deutz,[3] as Executor of the estate of Paul L. Deutz, Jr. and co-trustee of the Trust, and Joanne Deutz as Co-Trustee of the Trust (Danny and Joanne together as Appellants). The suit went to trial where a jury found that Respondents had not breached the agreement, and thus, Appellants were not excused from making payments under that agreement. In addition, the trial court awarded specific performance.

Appellants appeal, contending the trial court abused its discretion by excluding a witness from testifying and failing to exclude evidence or discussion of Appellants' wealth. In addition, Appellants claim that substantial evidence does not support the trial court's finding that specific performance was warranted. We disagree with Appellants' contentions. Accordingly, we affirm the judgment.

---

[1] When necessary and to avoid confusion, we refer to Respondents by their first names.

[2] This opinion involves several members of the Deutz family. To avoid confusion, we shall refer to members of the Deutz family by their respective first names.

[3] Joseph Daniel Deutz was referred to as "Danny" during trial. For the sake of consistency, we will do the same in this opinion.

## FACTUAL BACKGROUND

Ines, age 94, and Efren, age 90, have been married for over 70 years. They have worked for members of the Deutz family for about 50 years in both Mexico and California. In 1953, Efren began working for Paul Deutz, Sr. in Mexico. Efren served as Paul, Sr.'s chauffer and bartender. He "helped in the kitchen," vacuumed, cleaned the windows, and painted the house multiple times. Respondents lived at Paul, Sr.'s home in Mexico (rent free) for about six years, and three of their children were born in that home.

Around 1982, Efren began working as Paul, Sr.'s nurse in the United States. He helped Paul, Sr. to "bathe, shave, [and] . . . dress." Because Paul, Sr. had tremors from Parkinson's disease, Efren sometimes fed him. In total, Efren worked for Paul, Sr. for about 30 years until Paul, Sr. passed away in 1985.

About three years later, Efren moved to Rancho Santa Fe, California to work for Paul, Jr., Paul, Sr.'s son.[4] Paul, Jr. was married to Joanne Deutz. Respondents worked for Paul, Jr. and Joanne for 20 years. Ines was the housekeeper, who cooked, ironed, washed clothes, and cleaned the dishes. She also cleaned the bedrooms and bathrooms at Paul, Jr.'s home. Efren cleaned the home's windows, handled minor plumbing issues, took care of the dogs, assisted in the kitchen, helped with guests (including making drinks for them), served Paul, Jr. and Joanne breakfast in bed, cleaned the piano, emptied the inside trash cans, cleaned the taxidermized animals, washed the cars, picked up clothes from the dry cleaner, and went grocery shopping for the household.

---

[4] Efren met Paul, Jr. through his father when Efren and Paul, Jr. were young men. They enjoyed a close, trusting relationship.

In 2007, Respondents decided to retire. Paul, Jr. and Respondents negotiated a retirement arrangement, which was memorialized in a letter dated June 18, 2007. The letter was addressed to Efren and created "conditions of . . . retirement" "[i]n gratitude for the years of services that [Efren] ha[d] well executed, first with [Paul, Sr.] and later with [Paul, Jr.]." The conditions included a lifetime pension to Efren of $2,000 per month to begin in September 2007, health insurance for Respondents, $50,000 for a one time down payment to purchase a home, and an additional $1,000 per month for seven years to contribute to mortgage payments.

After disputes arose under the letter agreement, Paul, Jr.[5] and Respondents entered into a written settlement agreement in May 2016. The settlement agreement superseded the previous letter agreement.

Per the settlement agreement, beginning May 1, 2016, Efren was to receive monthly payments of $3,000 for the rest of his life. If he predeceased Ines, then Ines would receive $1,000 per month beginning on the first of the month following Efren's death. Also, the settlement agreement ended any obligation of Paul, Jr. or the Trust to provide health insurance benefits to Respondents.

Among other provisions,[6] the settlement agreement included a section entitled, "No Contact on Financial Matters," which provided:

> "EFREN, INES, and the Garcia family agree they will not in
> the future contact or attempt to contact PAUL or any of the

---

[5]  Paul, Jr. executed the settlement agreement individually and as trustee of the Trust.

[6]  Relevant here, the settlement agreement included a confidentiality provision that required the parties to the agreement to refrain from disclosing the existence and content of the agreement as well as the facts and negotiations leading up to the settlement agreement.

Deutz family to request further financial amounts or financial documents or to make any further request for payment other than as provided for in this AGREEMENT."

Efren received his $3,000 monthly payments from May 2016 until April 2020.

In the spring of 2020, Danny called Respondents' son, Alfredo, to inform him that the monthly retirement payments under the settlement agreement would be ending. Danny told Alfredo that the Trust lacked the money to make any further payments. He provided no other explanation regarding why the payments would end.

Paul, Jr. passed away in May 2020.

In October 2020, Respondents brought suit for breach of contract and specific performance against Appellants. Because of Respondents' advanced age, the trial court granted their request for trial preference, and the matter proceeded to trial on January 7, 2022.

At trial, there was only one factual/legal issue presented to the jury as reflected by the special verdict form: did Respondents breach the settlement agreement thereby excusing Appellants' performance under that agreement.[7] To this end, Appellants argued that Efren breached the settlement agreement by asking Paul, Jr., Joanne, and Danny to split his monthly $3,000 payment into two separate payments for $1,500 each. In addition, Efren allegedly made these requests at Paul, Jr.'s company, Totem Enterprises (Totem), in front of Paul, Jr.'s secretary, Christine Gong, and

---

[7]     The parties agreed that they entered into a valid contract (the settlement agreement). Additionally, the evidence was undisputed that Appellants failed to do something required under the settlement agreement, namely pay Efren. Moreover, if the jury found that Appellants had breached the settlement agreement, the parties stipulated to the amount of damages owed.

5

another coworker, Ted Roth. According to Danny, Efren wanted the payment split so that he could qualify for government assisted healthcare. Apparently, the $3,000 payment made Efren ineligible for such government largesse. Efren denied making any request to split his monthly payments into two, smaller payments or having contact with the Deutz family after he entered into the settlement agreement.

Also, Danny testified that he received a phone call from Respondents' neighbor asking him to please help Respondents obtain medical insurance. Danny claimed that the neighbor's request violated the confidentiality provision of the settlement agreement.

After the close of evidence, the jury found in favor of Respondents. Specifically, the jury answered the following questions in the affirmative: (1) Did the Respondents do all, or substantially all, of the significant things that the contract required them to do; (2) Did the estate of Paul, Jr. fail to do something that was required of it under the contract; and (3) Were Respondents harmed by the breach of contract by the Estate of Paul, Jr.

Following the end of the jury trial, the trial court requested the parties submit briefs regarding Respondents' claim for specific performance. The parties submitted the briefs, and the court produced a seven-page, thoroughly reasoned minute order, awarding specific performance. The court explained:

> "The jury's signed Verdict Form reflects that the jury found that . . . [Appellants] failed to perform under the contact, Question 2., that . . . [Respondents] were harmed thereby, Question 3., and as to the key issue, *that . . . [Respondents] did all, or substantially all, of the significant things that the contract required them to do* reflected in Question 1. Thus, the jury rejected or found not credible the reasons [Appellants] advanced for failing to perform on the contract after the death of Mr. Paul Deutz, Jr.

6

"The jury implicitly did not believe (1) that [Efren] requested two checks from the Deutz's and/or that [Efren] disclosed the details of the Mutual Release and Waiver Agreement to anyone, or (2) that the alleged 'two-check request' by [Efren] or the discussion with the neighbor were the real reasons the Deutz's stopped paying [Efren], or (3) that these reasons if they actually occurred were sufficiently significant to constitute a 'material' breach of the agreement by . . . [Respondents] justifying the termination of [Appellants'] performance.

"As a first reason for granting [Respondents'] request for the equitable remedy of Specific Performance, the Court believes that the evidence justifies any or all of these jury findings.  In other words, the Court gives full faith and credit to the jury's determination that the reasons proffered by the defense for terminating performance were either not credible or not sufficiently significant to justify termination."

The trial court also illustrated that it independently did not find Appellants' "proffered excuses for non-performance to be credible."  Thus, the court emphasized that "there was no believable rationale for Danny Deutz to not tell Mr. Alfredo Garcia about them when he announced termination of payments."  Rather, the court observed "these justifications seemed to materialize after the lawsuit was filed."

Additionally, the court noted that Appellants' discovery responses undermined Appellants' proffered justifications for failing to pay Respondents under the settlement agreement because "[t]he number of alleged contractual violations seemed to multiply and become more involved with each new exchange of information.  The excuses for terminating the contract were even augmented as the attorneys walked through the courtroom door for trial.  This sequence suggested that the new justifications were attorney, rather than witness, driven."

7

Moreover, the court explained why it found Danny not credible. And it stated its reasons for concluding that Respondents did not breach the settlement agreement:

> "If it is true that [Efren] requested two $1500 checks instead of one $3000 check, which [Efren] denied, the Court does not believe that this would constitute a 'material breach' of the contract. [Efren] did not ask for more money. The Deutz's never considered providing him with two checks. If the request was actually made, it was portrayed as a random idea floated by [Efren] to get medical care that never came close to fruition; a minor annoyance to the Deutz's. The Court makes the same finding as to the evidence presented that a neighbor of [Efren] called the Deutz's to ask for help with [Efren's] medical coverage, allegedly betraying a breach of the confidentiality provision of the contract."

The court subsequently entered judgment in favor of Respondents, awarding them $72,650.96 in damages as well as specific performance (requiring monthly payments of $3,000 the reminder of Efren's life and, after his death, monthly payments of $1,000 to Ines, provided she survives Efren). The court also awarded Respondents $5,158.90 in costs.

Appellants timely appealed.

## DISCUSSION

### I

### EXCLUSION OF WITNESS

#### A. Appellants' Contentions

Appellants claim the trial court abused its discretion when it did not allow them to call Gong as an impeachment witness. As discussed *ante*, Gong was Paul, Jr.'s secretary at Totem. As we discuss *post*, we agree the trial court properly exercised its discretion to exclude Gong as a witness at trial

8

because Appellants did not list her as a witness on the joint trial conference report.

    B.  Background

After deposing Efren only days before trial, Appellants applied ex parte for an order allowing them to call Gong as an impeachment witness.[8]  As explained in their application, Appellants claimed they "had no idea" until deposing Efren that he would lie about talking to Gong concerning financial matters in violation of the settlement agreement.  Thus, Appellants requested that the court allow them to call Gong as a witness at trial to impeach Efren.  At that point, the parties had already submitted the trial readiness conference report, and Gong was not listed a witness.

Respondents opposed the ex parte application, contending Gong was a percipient witness relevant to Appellants' affirmative defense that Respondents breached the settlement agreement.

The record does not contain a transcript of the ex parte hearing.  And the minute order indicates that the trial court deferred ruling on the application until trial.  However, at the motion in limine hearing, the court summarized, on the record, what occurred at the ex parte hearing as well as the court's evaluation of the dispute regarding Gong testifying at trial:

> "At an ex parte hearing that was maybe two days before what was anticipated as our trial call . . . .  I met the lawyers ex parte, and I believe it was [Respondents' counsel] who brought up the following proposition:
>
> "She said that we have conducted discovery on this thing, that this case has gone for a long, long, long time, and that

---

[8]    Appellants also sought leave to call an additional impeachment witness but subsequently abandoned that request when the witness became unavailable to testify at trial.  As such, we do not identity or discuss that additional witness.

within the past day or two—and you can correct me on the timing. That's what I want you to do. The defense has now indicated that they have two witnesses, witnesses that used to work for . . . Paul Deutz's, Jr.'s company, who are willing to testify that [Respondents], one or both, told them, the two witnesses, all about the arrangement with . . . Paul Deutz, Jr., that this—I think it's reflected in this—in the primary agreement that we will be dealing with, which is a release and settlement agreement, and that this evidence was relevant because there was a provision in that very agreement that prohibited disclosure of any of the details of the arrangement, and that this would prove a couple of things, or was offered to prove a couple of things.

"The primary one—and this is . . . [Respondents'] articulation of this. The primary thing is to prove that they—that . . . [Respondents] breached the contract, and the defense wants to do that so that they can say that their performance—the payment of the DTLs were—was excused.

"The—defense . . . articulated that most of that was true, but the reason that we want to introduce them is not to prove our affirmative defense, but it's on credibility issues. It's to put them as impeachment witnesses or rebuttal secret—they were secret atom bombs or—what are they called—torpedo[e]s. They were secret stealthy torpedo[e]s that were just used for impeachment to attack—to attack their credibility, et cetera.

"So the Court, at the time, felt that, as articulated by [Respondents'] counsel, that the—the affirmative defense that . . . [Respondents] breached the contract by disclosing the details to outside people has existed all the way through this case, and that [the] evidence was entirely and totally consistent with the affirmative defense such that these weren't impeachment witnesses; these were bona fide primary defense witnesses that—whose testimony would be more accurately characterized as proper to prove our defense in the case.

10

"They are not impeachment witnesses; they are affirmative defense witnesses instead. And given the chronology of the case, which the Court will articulate from my standpoint in just one moment, I felt that they were not properly—they should not testify in the case. But I indicated to [Appellants' counsel] that, you know, there was a lot to it. We're here at an ex parte hearing, and we'll talk about it more, at which time I would make my final decision. And I may have even said I need to hear more evidence, but— with that."

The court continued to explain the chronology of the case, noting that Appellants failed to timely take Respondents' depositions. Nonetheless, the court allowed Appellants to take Efren's deposition after the discovery cut-off date because there was some confusion regarding whether the trial date could be continued after the court granted Respondents' preference motion.[9] The court also commented that Gong "all of a sudden" "pop[ped] up . . . after the Trial Readiness Conference Report was made, and [she] [was] not even on there."

The court then explained that it did not view Gong as an impeachment witness but a percipient witness that should have been disclosed during discovery:

"And the Court feels that under those circumstances, and under the Court's willingness to allow you to take the deposition, I gave you a gift in allowing you to do that under the circumstances. That the new discovery of two witnesses that seem to be around or available during the pendency of this case.

---

[9] The court originally granted Appellants' motion for a trial continuance. Subsequently, the court realized it could not continue the trial outside the 120-day preference deadline after it had granted Respondents' motion for preference. (See Code Civ. Proc., § 36, subd. (f).) Thus, the court moved the trial back to its previous date.

11

> "I don't think it would be fair and just to allow them to
> testify under the circumstances. And, you know, you can
> call them impeachment witnesses, but really they fit more
> squarely within the category of witnesses that would have
> established affirmatively your affirmative defenses."

Next, the court asked the parties "to provide any further factual basis for this for the record." Respondents' counsel emphasized that Appellants took Efren's deposition after the parties submitted the trial readiness conference report, which included witnesses (and Gong was not on the witness list). Further, Respondents' counsel noted that Respondents submitted written discovery to Appellants, asking for all facts, witnesses, and documents relating to their affirmative defenses, which included breach of contract. However, Appellants did not identify Gong as a witness in response to any written discovery. Counsel argued that Appellants had an obligation to undertake a "deep dive" to discover the identity of witnesses with knowledge of their affirmative defenses.

In response, Appellants' counsel maintained that he was not aware that Gong had any knowledge of any breach of the settlement agreement. Counsel only asked Efren during his deposition if he talked to her about the settlement agreement because Danny knew that Respondents, from time to time, had gone into the Totem office and "maybe they said something while they were there." Only after Efren denied talking to Gong about the settlement agreement did Appellants' counsel contact Gong to find out what she knew, after which Appellants disclosed Gong as an impeachment witness.

Following counsels' arguments, the court explained that it was not going to allow Gong to testify at trial:

> "I feel that—that this was a preference case from the
> beginning, that [Appellants' counsel] knew of the existence
> of these people. It sounds like she was a confidant, as all
> secretaries usually are, of the primary players, both Paul

12

Deutz, Jr. and who we're calling Daniel Deutz or Danny Deutz as acting as their personal secretary for the business. I shouldn't say personal, but for their business secretary.

"There was awareness of that person and sounds like there was a—let's give a shot at this question at deposition as a final effort to explore this with . . . [Respondents], and that was not reflected with due diligence in determining who the proper witnesses might be for your affirmative defense that there was a breach of confidentiality.

"It's really a matter of gross unfairness to . . . [Respondents] at this point to spring on them this new witness so late in the game, especially given the timing of the depositions of . . . [Respondents], which was a gratuity by the Court and a professional courtesy of the Court to allow you to take their deposition.

"So I'm—that's going to be my ruling on this person until I hear evidence to the contrary."

Despite ruling that Gong would not be permitted to testify, the court told Appellants' counsel that it would welcome him to revisit this issue at an appropriate time if he remained interested in calling Gong as a witness.

Appellants do not point to anywhere in the record where their trial counsel asked the court to revisit this issue.

C.  Analysis

" 'Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion.' " (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639.)  The court's " 'discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered.' " (*Id.* at p. 640.)  Even where a trial court improperly excludes evidence, the error does not require reversal of the judgment unless the error resulted in a miscarriage of justice.  (Cal. Const., art. VI, § 13.)

13

Here, Appellants contend the trial court abused its discretion by not allowing Gong to testify as an impeachment witness. In framing this issue in that manner, Appellants spend little time addressing the trial court's critical determination that Gong was not an impeachment witness but a witness with personal knowledge of Efren's alleged breach of the settlement agreement. Indeed, Appellants simply contend the court based its "belief, as to which there was not any evidence or argument, [on the assumption] that as a secretary, Ms. Gong was Paul's and Danny's, confidant." This is not an accurate representation of the record.

Although the court referred to Gong as a confidant of Paul, Jr. and Danny, that description was not central to the court's reasoning. Instead, the court considered argument from the parties as well as what occurred during discovery. The court observed that Appellants' primary affirmative defense in the case was that Efren breached the settlement agreement by asking for his monthly check to be split into two smaller payments. The court further noted that Gong was well known to both Paul, Jr. and Danny because she served as their secretary at Totem. Thus, if Efren had requested his payments be split while visiting Totem, the court found that Appellants should have been aware of it. Moreover, Gong, who would likely have been present during any request Efren made at Totem, should be classified as a percipient witness not an impeachment witness. In other words, Gong could provide direct evidence of Efren's alleged breach. Yet, Appellants did not list her as a witness in the joint trial conference report. Under San Diego Superior Court Local Rule 2.1.15 (Local Rule 2.1.15), a trial court has discretion to exclude any witness or exhibit that was not listed in the joint

14

report. Thus, the trial court concluded that it would be unfair to Respondents to allow Appellants to call Gong as a trial witness "so late in the game."[10]

Also, Danny's testimony at trial buttressed the trial court's reasoning in excluding Gong. Danny testified that he witnessed Efren approach Gong, in addition to others, at Totem and ask for his monthly payment to be split into two smaller payments. He further testified that he was present, along with Gong, at Totem's offices when Efren requested split payments. Therefore, Danny's trial testimony showed that Appellants were aware that Gong had personal knowledge of Efren's alleged breach of the settlement agreement. Yet, they elected not to include her as a trial witness on the joint trial readiness conference report.

Moreover, Danny's trial testimony belies his counsel's argument below in contending that Gong was an impeachment witness that became known only after Efren was deposed. Appellants' counsel explained:

> "When I was going to take Efren's deposition, Daniel—I'm not disclosing, I don't think, a privileged communication—suggested I ask questions because we know—or Joseph Daniel Deutz, Daniel Deutz, knew that the [Respondents] had, from time to time, gone into the Totem office. He said *maybe* they said something while they were there.
>
> "So I asked [Efren] on 12-29 about communications with . . . Ms. Gong, and he said there were some. And I

---

10    Appellants also argue that exclusion of a witness is not one of the remedies provided in the Code of Civil Procedure for incomplete discovery responses, unless those responses are "willfully false." (See *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 332-334.) Here, they imply the court could not exclude Gong without finding that their discovery responses were "*intentionally not true*." (See *id.* at p. 334.) However, there is no indication that the court excluded Gong as a witness because of incomplete discovery responses. Rather, the court exercised its discretion under Local Rule 2.1.15 to exclude Gong because she was not listed as a witness on the joint trial readiness conference report.

15

> asked specifically about whether there were some conversations where either—[Efren] either asked for more money, or he asked for that split check deal." (italics added.)

Thus, Appellants' counsel represented to the trial court that the idea that Gong might have heard Efren request split payments originated near the time counsel was preparing to take Efren's deposition. In other words, before Efren's deposition, Appellants were not sure if Gong ever heard Efren request split payments, but Danny suggested counsel ask about it during deposition because he was aware that Respondents had visited Totem's office where Gong worked. Yet, at trial, Danny testified that he seen and heard Efren request split payments at the Totem office in front of Gong. Indeed, he testified to some of these requests as evidence that Efren breached the settlement agreement. Therefore, it cannot be true that Danny witnessed Efren breaching the settlement agreement before Gong, and Appellants only discovered during Efren's deposition that Gong had knowledge of the alleged breach.

Finally, we are not persuaded by Appellants' argument that Respondents were aware that Gong could be a witness based on some notes of the attorney who drafted the settlement agreement.[11] Respondents' counsel admitted to the court that she came across Gong's name in reviewing the drafting attorney's notes, but there is no indication that counsel was aware that Gong had any knowledge of Respondents' alleged breaches of the settlement agreement.

---

[11] Apparently, the attorney who drafted the settlement agreement formerly worked at the same firm as Respondents' trial counsel.

16

Against this backdrop, we conclude the trial court did not abuse its discretion in determining Gong was a percipient witness and excluding her from testifying at trial.

## II

## EVIDENCE OF APPELLANTS' WEALTH

### A.  Appellants' Contentions

Appellants maintain that the trial court committed reversible error by failing to exclude discussion or evidence of their wealth.  We disagree.

### B.  Background

Appellants brought two motions in limine relating to their wealth.  In their first motion in limine, they sought an order to exclude any evidence of their poor personal finances under Evidence Code section 352.  The second motion concerned the exclusion of evidence of Appellants' "alleged wealthy condition, strong financial position or the address of which they formally resided on the grounds that disclosure of such information will be more prejudicial than probative under Evidence Code [section] 352."

The court entertained oral argument regarding the two motions and ultimately denied them both.  However, the court explained how it believed the parties' respective financial circumstances might play a role at trial:

> "So, yeah, I mean, I think . . . the whole fabric of this case is going to reflect quite a big difference in the economic status of the parties just by the way it's described in—describing the relationships, and I think it's—I think it's unavoidable.
>
> "And so to the extent that we need some background from the jury to understand what the relationships are, to understand why they entered into the contract, and how it was supposed to work, I think there's going to be some necessary descriptive material that may suggest that one party has great economic advantage over another.

17

"But I don't want this to be a violin sob story during the entire part of—the entire trial, even in the closing arguments."

In making a record, Appellants' counsel emphasized that CACI No. 117 instructs the jury not to consider the wealth or poverty of any party in reaching a verdict. Additionally, counsel noted that California law prohibits an attorney from deliberately attempting to appeal to the social or economic prejudice of the jury, including the wealth or poverty of the litigants.

The court agreed with Appellants' counsel and warned the attorneys to follow the law on this point or there could be a mistrial. Also, the court indicated that it would admonish the jury to not hold the parties' respective financial circumstances against them.[12]

During her opening statement, Respondents' counsel began as follows:

> "Good morning, ladies and gentlemen. North of this courthouse in the luxurious community of Rancho Santa Fe is a beautiful gated home with a pool and a guesthouse on several acres of luscious landscaped land and manicured gardens. This estate was the home of Paul Deutz, Jr. and his wife Ms. Deutz. Ms. Joan[ne] Deutz. Ms. Deutz still resides at this beautiful estate today.
>
> "This grand estate is where many of the events in this case took place, and this grand estate is where the plaintiffs, Efren and Ines Garcia, worked for nearly 20 years. Plaintiffs are a married couple celebrating their 70-year anniversary this year. And during those 20 years that Efren and Ines worked at this beautiful estate, Ines was the full-time maid and housekeeper. She cleaned the bathrooms and the bedrooms. She washed the clothes, did the laundry, ironed the clothes for the Deutz family, she

---

12    Neither party cites to the record where the court admonished the jury on this issue.

18

polished silver, and she cooked as well, and did everything she could to keep the house looking immaculate.

"Efren was Mr. Deutz's butler and right-hand man. Each day Efren would start his day by doing one of his daily duties which was to serve Mr. and Ms. [Deutz] their breakfast in bed. After serving their breakfast in bed, Efren would do one of various household jobs. He would dust the extensive taxidermy collection that the family had. He would be on his hands and knees polishing the nice floors. He would be cleaning the floor-to-ceiling windows. He would prepare cocktails in the same room where the taxidermy was along the wall."

Appellants' counsel did not object to any portion of Respondents' opening statement. And counsel stated in his opening statement, at least three times, that the Deutz family lived in Rancho Santa Fe. Further, Appellants' counsel underscored the disparity between Efren's financial situation and that of the Deutz family, especially Paul, Sr. and Paul, Jr. To this end, counsel told the jury that Paul, Sr. met Efren when he was "on the streets of Mexico City" and then "offered Efren a job and allowed Efren and Ines to live in his home in Mexico City." Appellants' counsel stated that Efren's prospects "in Mexico were not good before Paul, Sr. invited him into his home and paid him quite well." Counsel maintained that Efren was "lucky enough to get a job in the Deutz household, he prospered compared to a lot of people who were on the streets of Mexico City at the time."

Appellants' counsel noted that Paul, Sr. loaned Efren $30,000 to allow him to buy an apartment in Mexico City, which Respondents "ultimately sold and kept the money."

Moreover, Appellants' counsel also pointed out that the Deutz family's financial situation suffered beginning in the 1980s and was dire by the time Paul, Jr. passed away:

19

"Now, Paul Deutz, as an investor, did well up until about the '80s, which I think most of us remember, there was a pretty big stockmarket crash as a result of banks making loans to people who couldn't pay them back. And that affected the economy. They even made movies about this subject. And that hit Paul Deutz very hard because he was in the market. And things digressed and the economic situation for Paul Deutz worsened over time to the point that when he passed away, he left an estate and a trust that had less than $100 in it. That's how bad things got for Paul Deutz."

Later during his opening statement, Appellants' counsel returned to the comparative wealth of the parties. But this time, he noted that, not only had the financial gap between the families decreased, but, perhaps, the pendulum had swung:

"So Efren—there was a lot of discussion earlier about the poor and the rich. Efren was not poor by any means. And there have been times where Efren's net worth [was] higher than Danny's net worth. And Danny, by the way, is currently unemployed at this time."

Counsel also stressed that there was no money left in the Trust to pay Respondents: "Paul Deutz was out of money. His estate had no money left. The Papa Delta Trust had no money . . . there was just no money to there to pay Efren."

After opening statements and some trial testimony by Danny, during a break in trial, Appellants' counsel argued that Respondents' counsel had made it a theme of her case that the Deutz family was rich. In response, Respondents' counsel countered that she had to discuss the jobs that Respondents performed for the Deutz family, which included washing their cars (a Rolls-Royce and Mercedes Benz).

20

The court then commented:

"All right  So let me just say this:  For the most part, I agree with [Respondents' counsel] that, you know, she was descriptive of the work that he was doing and, unfortunately, the work involved a lot of the indicia of, well, you know, washing the cars, serving people breakfast in bed.  You know, cleaning the house and all those sorts of things, getting groceries.  So that's that.

"But I do think, [Respondents' counsel], that you did sort of make it a theme that these people were ultra wealthy. There were other parts of it that didn't pertain to the work that he did.  It was like the Beverly Hillbillies, swimming pools, movie stars, you know, you-all come back now, ya hear.  And I think you went over the top on that.  So I'm going to—so I didn't hear objections, but it is what it is.

"And I may instruct the jury again that unless it's directed towards some specific issue, the relative wealth of the people is not automatically an issue in this case.  And I'm going to ask that in your closing argument, there is no gratuitous comments about outrageous wealth and stuff like that.

"So carefully craft your closing argument to direct it toward the work that he did, whatever.  And if the work that he did involve Rolls-Royces, I mean, you can't say the word, Rolls-Royce, without thinking wealth, you know.  That's just the way it is.  That's what a Rolls-Royce is. . . .  [¶]

"But Rolls-Royce is what we think of as wealth, and, unfortunately, that's what he was washing.

"Now, did it have to be Rolls-Royce?  It could have been washing the cars in light of the ruling that I made and his complaint that he's making.  Could have been just washing the cars.  Did you wash the vehicles that the Deutzes owned?  Would have been you being sensitive to my ruling, but, no, the choice was specifically made to go in that area.

21

"So I am sensitive to what [Appellants' counsel] has stated, but we have what we have, and I'm going to ask that we step way back from that theme, okay?"

Respondents' counsel indicated that she understood the court, and Appellants' counsel thanked the court.

Yet, the wealth of the parties continued to be discussed at trial. For example, during the direct examination of Joanne, Appellants' counsel asked the following question: "We heard yesterday about Rolls-Royces and luxurious surroundings. Do you have any idea of what Paul Deutz's net worth was when he passed away?" The trial court sustained a relevancy objection and reminded the jury of an earlier admonition:

"Ladies and gentlemen, when we—again, when we had our jury discussions, all of you said that unless it was related to some issue that the wealth and disparity between the parties was not going to be a motivating factor for your verdict. It's going to be on the evidence.

"So if there was mention of Rolls-Royces or whatever, unless it's pertinent to some material issue in the case, that's not to be—the wealth issue is not to be considered, okay?

"Everybody good with it still?"

During closing argument, among other topics, Respondents' counsel questioned Danny's credibility and whether he was telling the truth regarding the financial condition of the Trust as well as Appellants' wealth. Yet, in doing so, she emphasized, "But at the end of the day, in the final analysis, the judge has said that wealth or lack of it has nothing to do with determining breach in this case." Other than that reference, Respondents' counsel did not discuss Appellants' financial condition during closing argument.

22

During his closing argument, Appellants' counsel focused the jury on the financial condition of the parties:

> "The case was also spun, although the judge at the beginning told you the relative economic positions of the clients shouldn't be considered.  The [Respondents] spent a lot of time talking about Mercedes Benzes and Rolls Royces when they simply could have said Efren washing cars, talking about opulent pools, luxurious homes, getting a new boat in Acapulco.  All of that was done to case my clients as if they are multi, multi-millionaires.

> "Now, that was done, again, to point out admittingly the Garcias and the Deutzes were in different economic stratus [*sic*].  That's what happens when help works for somebody who's making more money at the time, but they exaggerated that fact to garner your sympathy so that you would conclude, surely the Deutz could just pay them the money, regardless of the evidence.  And that's not how you decide this case."

In addition, Appellants' counsel argued that the Deutz family experienced more recent financial hardships and noted that Danny remained unemployed.  However, he cautioned the jury that these facts were not important to the case but created "an aura of sympathy, and it's a misleading aura of sympathy."  Counsel then discussed, in detail, how much Respondents were paid (both in terms of money and health insurance) for their services to the Deutz family.

Appellants' counsel also explained why the Deutz family's generosity and its current lack of money mattered in the instant action:

> "And the point of all that is that the Deutz family is no longer as rich as you might think or the [Respondents] would like to have you think, and the [Respondents] did pretty darn well for two kids from Mexico City, one of who[m] left school at age 15; the other who left school at 14. And, [to] quote, Efren Garcia's testimony, working for the Deutzes was the smartest decision he ever made in his life.

> All of that was raised again to make you feel sympathy for the [Respondents], and the [Respondents'] hope was that sympathy would override the legal instructions you heard from the judge and get you to rule based on the socioeconomic issues that were portrayed by [Respondents'] counsel rather than the law. And you need to follow the law, and the judge spent a lot of time earlier on in the case explaining that to you."

## C. Analysis

Here, Appellants argue that Respondents' made the wealth of the Deutz family and Respondents' relative poverty "a central issue in what was a straightforward contract case." Therefore, relying on *Love v. Wolf* (1964) 226 Cal.App.2d 378 (*Love*), Appellants maintain the trial court committed reversible error by allowing Respondents t0o focus on Appellants' wealth. *Love* does not help Appellants' argument in the instant matter.

In *Love*, which was a case against a drug company and a doctor for damages caused by a prescription drug, the court found over 60 instances of "flagrant misconduct" by plaintiff's attorney from the beginning to the end of a trial, which lasted about three weeks. The misconduct there consisted of remarks in opening statement that people were dying all over the country from the drug, that the defendant had no regard for the safety of people using the drug, there was not a bigger "*con outfit*" in the world than defendant; that defendant was a gangster and the doctor its gunman, and an unfounded insinuation that defendant had bribed the Food and Drug Administration. (*Love, supra*, 226 Cal.App.2d at pp. 385-386.) Counsel also brought before the jury matters never received in evidence and engaged in "vilification and abuse" of opposing counsel. (*Id.* at p. 391.) The court characterized the misconduct of plaintiff's trial counsel as "egregious beyond any in our

24

experience or that related in any reported case brought to our attention . . . ." (*Id.* at p. 382.)

Although one of the areas of misconduct involved the plaintiff's counsel misusing evidence of one of the defendant's wealth (see *Love, supra,* 226 Cal.App.2d at pp. 387-389), there is no comparison between the conduct in the instant action and that of the trial counsel in *Love.* Indeed, in denying Appellants' motions in limine aimed at the admissibility of evidence of their wealth, the trial court proved prescient when he observed that "the whole fabric of this case is going to reflect quite a big difference in the economic status of the parties by . . . describing the relationships, and . . . I think it's unavoidable." At trial, both Appellants and Respondents used the comparative wealth of the parties when it suited their respective theories of the case. Similarly, both parties discussed the changing financial condition of the Deutz family to provide context to the dispute. But the court admonished the jury not to consider the parties' relative financial conditions when reaching a verdict, and Appellants' counsel and Respondents' counsel, during closing argument, reminded the jury that it could not consider the wealth or lack of wealth of the parties in determining whether Respondents had breached the settlement agreement.

In short, on the record before us, we conclude the trial court did not abuse its discretion in allowing both parties to discuss the Deutz's family's wealth to provide context to the breach of contract action.

### III

### SPECIFIC PERFORMANCE

To obtain specific performance after a breach of contract, a plaintiff must generally show: "(1) the inadequacy of his legal remedy; (2) an underlying contract that is both reasonable and supported by adequate

25

consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract. [Citations.]" (*Tamarind Lithography Workshop, Inc. v. Sanders* (1983) 143 Cal.App.3d 571, 575 (*Tamarind*); see *Henderson v. Fisher* (1965) 236 Cal.App.2d 468, 473.)  A grant or denial of specific performance is reviewed under an abuse of discretion standard.  (*Petersen v. Hartell* (1985) 40 Cal.3d 102, 110; *Real Estate Analytics, LLC v. Vallas* (2008) 160 Cal.App.4th 463, 472.)  However, regarding the underlying facts on which the trial court relied to order specific performance, we apply the substantial evidence standard of review.  (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711; *Williamson v. Brooks* (2017) 7 Cal.App.5th 1294, 1299.)

Here, Appellants maintain that substantial evidence does not support the court's factual findings fundamental to its award of specific performance. Under the substantial evidence standard of review, "findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150, 162 (*Ribakoff*); see *Vasquez v. LBS Financial Credit Union* (2020) 52 Cal.App.5th 97, 109.)  " 'A single witness's testimony may constitute substantial evidence to support a finding.  [Citation.]  It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility. [Citation.]  "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness."  [Citation.]  Specifically, "[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that

the trial court impliedly made every factual finding necessary to support its decision." [Citation.] ' " (*Ribakoff*, at p. 162.)

As a threshold matter, we observe that Appellants do not discuss the required elements of specific performance. (See *Tamarind*, *supra*, 143 Cal.App.3d at p. 575 [listing elements].) Nor do they explain why any of the elements were not satisfied by substantial evidence. Instead, they pick two paragraphs in the court's seven page minute order and argue substantial evidence does not support the court's conclusions in those paragraphs. To this end, they assert "[n]o evidence, argument or inference supported the [t]rial [c]ourt's 'belief' " as set forth in the following paragraph:

> "The Court believes it more likely that Mr. Danny Deutz, now charged with managing his father's estate, with some possible diminution of the estate proceeds, especially after the funds were distributed under the terms of the will and trust, did not have an equal devotion to Mr. and Mrs. Garcia. Danny Deutz was not working independently of managing his father's estate and likely resented being saddled with an outdated economic obligation that would in some measure deplete his and his family's funds. Danny Deutz expressed this theme, 'lack of funds', to Alfredo Garcia, but nothing more as a reason for terminating the contract. But the estate's lack of funds did not constitute a legal basis [to] terminate the Deutz's contractual obligation."

Yet, Appellants' merely insist the trial court's " 'belief' " is unfounded but do not explain why this assertion matters. Further, contrary to Appellants' argument, we conclude the subject paragraph is supported by substantial evidence or is a reasonable inference based on substantial evidence. For example, evidence presented at trial showed that Danny was unemployed so he was not working independently of managing his father's estate. It was undisputed that Danny only told Alfredo that the Trust would

27

no longer pay Efren because it did not have sufficient funds to do so. And Danny testified that there was "virtually" no money in the Trust.

There was evidence proffered at trial establishing the warm, friendly, and close relationship between Efren and Paul, Jr. There was no similar evidence presented regarding the relationship between Danny and Efren. Moreover, the Deutz family, including Danny, had experienced an extreme change in financial circumstances to their detriment.

Against this backdrop, the trial court could reasonably infer Danny "did not have an equal devotion to" Respondents similar to what his father felt.

Also, it seems logical, based on the circumstances facing the Trust, Danny, and the Deutz family, that Danny could resent having to make payments to Efren when he, and the rest of his family, were not doing well financially.

Additionally, Appellants argue "no evidence supports" the trial court's conclusion in the following sentences:

> "The Deutz's never considered providing him with two checks. If the request was actually made, it was portrayed as a random idea floated by [Efren] to get medical care that never came close to fruition; a minor annoyance to the Deutz's."

Appellants are mistaken. Substantial evidence supports the court's conclusions and inferences in the above two sentences. Both Joanne and Danny testified that they never considered splitting the $3,000 payment into two payments consisting of $1,500. And there was no evidence that any other member of the Deutz family considered making split payments. Moreover, the number of times Danny claimed that Efren requested split payments changed throughout the litigation. In response to written discovery, Danny indicated that Efren made two requests to split payments. By the time Danny testified at trial, the number was increased to somewhere between

28

five and 10.  Danny tried to explain away this discrepancy by claiming that Efren asked so many times to split the payments that he finally decided to document the occurrences, so his response to written discovery was only based on documented occurrences. The court did not find Appellants, especially Danny, credible.  And there is no indication that, before the lawsuit, Appellants ever told Respondents that they breached the settlement agreement by asking for split payments.  Thus, it is a reasonable inference that, if Efren ever made a request to split payments, such a request was "a random idea . . . that never came close to fruition."  Additionally, the court's conclusion that Efren's request, if made, was a "minor annoyance to the Deutz's" is simply another way to say the request was not a material breach. That inference is supported by substantial evidence in that there was no evidence proffered at trial that anyone communicated to Respondents that they had breached the settlement agreement by asking for split payments before the lawsuit was initiated.

Finally, Appellants insist substantial evidence does not support the court's award of specific performance because they proved the existence of unclean hands.  "[T]he unclean hands doctrine is not a legal or technical defense to be used as a shield against a particular element of a cause of action.  Rather, it is an equitable rationale for refusing a plaintiff relief where principles of fairness dictate that the plaintiff should not recover, regardless of the merits of his claim.  It is available to protect the court from having its powers used to bring about an inequitable result in the litigation before it." (*Kendall–Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 985.)  By the same token, " '[w]henever an inequitable result would be accomplished by application of the "unclean hands" doctrine the courts have not hesitated to reject it.' "  (*Hillman v. Stults* (1968) 263 Cal.App.2d 848,

29

871, quoting *Womack v. Womack* (1966) 242 Cal.App.2d 572, 579.)  In addition, " 'the doctrine of unclean hands is heavily fact dependent' and generally involves a question of fact." (*Jackson v. LegalMatch.com* (2019) 42 Cal.App.5th 760, 779.)

Here, Appellants' theory of unclean hands rests on their claim that Efren repeatedly asked to split his monthly $3,000 payment into two $1,500 payments so he could defraud the government to receive subsidized health care.  Apparently, with the $3,000 payment, Efren was ineligible for government sponsored health care.  Therefore, in both their opening and reply briefs, Appellants cite to a bounty of testimony that they claim proves that Efren acted with unclean hands, and specific performance thus is improper.

Nonetheless, Appellants' argument is not appropriate for a substantial evidence review.  Appellants argued at trial that Respondents' breached the settlement agreement when Efren allegedly asked that his monthly payments be split in two.  The jury found otherwise.  Appellants made the same argument to the trial court in contending that Efren's unclean hands should prohibit an award of specific performance.  The trial court did not agree.  Now, Appellants are asking us to reach a different conclusion than the jury or the trial court below based on the same evidence presented at trial.  In essence, they are arguing that we should reweigh the evidence.  Such a task is beyond our role as an appellate court.  (See *Ribakoff, supra*, 27 Cal.App.5th at p. 162.)  As such, Appellants' argument necessarily fails.

DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:


BUCHANAN, J.


CASTILLO, J.